McMinn County Board of Education

*v.*

Lucille Anderson et al.

(*Knoxville*, September Term, 1955.)

(May Session, 1956)

Opinion filed June 8, 1956.

334

JACK JOHNSON, Athens, for appellant, School Board.

C. T. ZIEGLER and FRANK BRATTON, Athens, for appellees, Teachers.

MR. JUSTICE BURNETT delivered the opinion of the Court.

The suit was begun by numerous teachers, who had taught in the public schools of McMinn County for the biennium 1951-1953, seeking to have their salaries for that period the same as were paid them in the school year 1948-49. The Chancellor decided all issues in favor of the teachers. An appeal has been seasonably perfected, briefs filed and arguments heard and we now have the matter for disposition.

The appellant Board takes the position (1) that the declaring of the General Education Bill of 1951 unconstitutional does not restore the General Education Bill which immediately preceded it, to-wit: Chapter 9 of the Public Acts of 1949; (2) that, if the 1949 Act did become effective then Section 7 of Chapter 9 of that Act prescribes the county's rights and the amount of funds that they are required to raise are limited to the amount that they were required to raise for the years 1946-47; and (3) that the teachers are estopped to now seek this additional salary since they have each signed a contract agreeing to teach for the minimum salaries as provided by law.

After reading the excellent briefs herein some two or three times and doing considerable independent investi-

gation, Propositions (1) and (3) are very clear to us. Proposition (2) has given us far more trouble but we feel that we have arrived at the right conclusion as far as the answer to it is concerned. We will first respond to Propositions (1) and (3) and then take up Proposition (2).

■ Chapter 132 of the Public Acts of 1951 was the General Education Bill covering the biennium 1951 through 1953. This bill was brought into question and it was determined unconstitutional for the reasons stated in the opinion, the case of *City of Nashville v. Browning*, 192 Tenn. 597, 241, S.W.2d 583. This Act of 1951 which was declared unconstitutional was the next general act after the General Education Act which was passed in 1949. When the 1951 Act was declared unconstitutional then the 1949 Act became effective and operated for the next biennium. It is true that in the caption of the 1951 Act the 1949 Act was attempted to be repealed but the general law is, and sound reason demands, that a court hold when,

"an unconstitutional statute which purports to repeal a prior statute by specific provision is ineffective to establish a repeal when the validity of the substituted enactment is a prerequisite to repeal, * * *." Sutherland Statutory Construction, 3rd Ed., Vol. 1, Sec. 2033.

The footnotes to the quoted section above cite cases from many jurisdictions which are here applicable. In 82 C.J.S., Statutes, sec. 281, page 473, this is said:

"an act which is invalid or unconstitutional and void or inoperative does not repeal another valid act. The rule is well settled that an unconstitutional enactment will not repeal a former valid law by mere implication, even where the subsequent unconstitutional act de-

clares the repeal of all acts or parts of acts inconsistent therewith, and it is apparent that the repealing statute is to be substituted for the one repealed, since there is nothing that can conflict with a void statute."

Under this statement there are cases from various jurisdictions cited as authority therefor. Among the others is our case of *Biggs v. Beeler,* 180 Tenn. 198, 173 S.W.2d 144, and 946, 153 A.L.R. 510 (Poll Tax case). Cases from other jurisdictions there cited support our conclusion here that the 1951 Act being unconstitutional the 1949 Act remains in full force and effect until it is supplanted by a subsequent valid Act. The common sense of this conclusion is evident and must be true. We must have valid legislation under which to administer our educational system. Therefore if an act is passed which is unconstitutional then the immediate preceding constitutional act must stand in its stead until some other valid enactment is enacted by the Legislature.

The third proposition as posed by the appeal is that the teachers are estopped to claim the additional salary sued for, their contracts having specifically provided for the minimum salary set by the State Board of Education. The appellee Teachers have entered into a contract with the appellant Board for the biennium 1951-1953 for salaries only that equal the amount of the State Minimum Salary. Their contention is that they were entitled to the additional amounts granted by the Board during the school year 1948-49 under Chapter 9 of the Public Acts of 1949 here in qeustion.

All teachers who teach in the public schools must enter into written contracts with the School Board and these contracts are supplied by the Commissioner of Education. T.C.A. sec. 49-1305. The General Education

Law of the State governs all teachers teaching in public education in the State schools. The counties of the State participate in various funds raised by different enactments for the purpose of public education and by so participating in these funds they likewise agree to and are bound by the statutes and acts controlling public education. The Chancellor held that the law as written in the various statutes must be read into the contracts as entered into by the teachers with the county. It seems to us that this is bound to be correct. The statute on the books that is applicable or one that is enacted that applies to the contract of a teacher of the county in public education in the making of the contract by the teacher with the county enters into and forms a part of the contract in the same manner as if it had actually been written or copied into the contract. The parties of either side of this contract would be, should be and are bound by these statutes as though they were actually copied into this contract.

Among other things, Section 9 of Chapter 9 of the Public Acts of 1949 provides that:

"* * * a salary not less than that contracted for as of the beginning of 1948-1949 school term as defined hereinabove in this paragraph, plus at least the difference between the amount to which he would be entitled under the state salary schedule of 1948-1949 and the state schedule the State Board of Education is herein instructed to set up for each year of the biennium 1949-1951."

When we consider this part of the statute as a part of the contract herein it certainly would seem that the teacher is thus entitled to the salary as paid them the year 1948-49 and that this statute becomes a part of their contract

even though the contract as signed they agreed to work for the minimum salary. They are not estopped to do this because these statutes and subsequent ones governing public education become a part of the contracts and it would be against public policy for the School Board in one county to barter with the teachers and beat them down to a less salary than the State law authorizes and directs that they have.

We will take judicial knowledge of the fact that over a period of years, as far back as we can remember, every candidate for Governor has promised to increase teachers' salaries. It is public knowledge that teachers ordinarily and normally are underpaid when you consider their training and education, etc. The various acts of the Legislature down through the years show distinctly that it was the purpose of the Legislature to try to increase the tax burden and shift considerable amounts of this tax burden to paying teachers' salaries. Chapter 1 of the Public Acts of 1947 embodies a resolution wherein these things are set out in detail, the various county governing bodies of the State are authorized for that year, one way or the other to increase teachers salaries for that year.

The whole scheme of enacting Chapter 9 of the Public Acts of 1949 was to assure each teacher of each county in the State that he or she would receive a raise, because the "Sales Tax Act" was enacted simultaneously with and as a complement to Chapter 9. Another provision of Section 9 of Chapter 9, which carries this idea still further, is:

"In cases of employment after the opening of the regular school term, the employee shall be guaranteed a salary increase at the rate of increase as herein set

forth over and above the annual salary to which he would have been entitled if he had been employed for a full term under the salary schedule in effect at the beginning of the 1948-1949 school term.''

Thus it seems to us in view of the part that the State plays in the control of public education, even though these contracts are made by the individual counties yet the counties through their participation in the State funds use the State money in payment of teachers and operation of their schools. Any statutory provisions made for this purpose should override and supersede anything in the contract which is repugnant to such statutory provisions. This being true the teachers are not estopped then to assert their rights to secure a higher salary which is provided by statute if it is necessary for them to assert such rights in court.

In answer to question number two, as raised by the appellant, we think the Chancellor correctly answered this question, that is, Section 7 of Chapter 9 of the Public Acts of 1949 does not conflict with Section 9 of that Act. In the first place we have shown above that the dominant intention of the Legislature in enacting the governing Chapter 9 of the Public Acts of 1949 was to secure to each teacher an increase in salary out of the sales tax which was levied at the same session and thus it was that the Legislature inserted the provision in the Act that the teachers would not only receive the minimum salary for teaching during that biennium, but would receive additional amounts commensurate with the amounts received by them, or others similarly situated, for teaching during the year 1948-49 school term, where they were over and above the minimum salaries set by the Department of Education for 1948-49. The teachers

of McMinn County were paid during 1948-49 some 15% more than the minimum salary as provided by the Act.

When we read Section 7, and particularly Subsection B of the Public Acts of 1949, this section would seem to conflict with Section 9 of Chapter 9 of the Act. Among other things Subsection B provides that:

"In no event, however, shall any county participating in the State Equalizing Funds under the provisions of this Act to be required to raise during either fiscal year of the biennium 1949-51 more money locally from all sources for school purposes than it raised during the school year of 1946-47, as determined by the State Commissioner of Education."

Under this provision of the Act the county argues that since McMinn County failed in this respect in the year 1951-52 in the amount of approximately $28,000 to raise the minimum that if any recovery should be had in this case that the recovery should be limited to the amount that the county failed to raise for the period specified.

It is provided in two or three places in the Act that Section 7 is merely for the purpose of determining "the cost of the local minimum school program as determined in the manner prescribed in Section 7 of this Act." Section 4 of the Act set up an amount of money to be divided among equalizing counties "in the manner prescribed in Section 7 of this Act." In other words, this Section 7 is merely a formula whereby the Department of Education works out the minimum that is to be raised locally and it has absolutely no bearing on the provisions of the Act and particularly Section 9 thereof requiring teachers' salaries to be as "originally contracted for the school term 1948-1949, or above that salary including the increments to which he would be entitled under the

salary schedule in effect at the beginning of the school year 1948-1949,'' etc. This provision is to determine the county's portion that they must raise privately when they participate in the equalizing funds as does McMinn County. This in no sense governs or undertakes to limit the right of the teachers to have this increased salary as provided in Section 9, above quoted. Section 7 and its provisions was simply a condition precedent to a county's participation in receiving the equalizing funds, and Section 9, taking the 1948-49 school term as a norm for minimum salaries prescribed as a condition antecedent that any county who participated in the equalizing funds should likewise pay the teachers amounts received for teaching during the 1948-49 school term over and above the minimum salaries set for that particular year.

The dominant intention of the Legislature was the increase in the teachers' salary. Even if Section 7 could be considered in conflict with Section 9, it would be our duty to give effect to the dominant overwhelming intention of the Legislature as above indicated. There is no conflict though because Section 7 merely governs the method used by the State Education Department in arriving at what the county or counties must raise locally when they are participating in the equalizing fund.

■ Again we say even if there were an irreconcilable conflict between these two sections, Section 9 should and will control as it is the later expression of the Legislature.

Thus we conclude that the cardinal purpose of the Legislature, in enacting Chapter 9 of the Public Acts of 1949, was to provide a raise in teachers' salaries, and to force the counties who participated in the equalizing fund to comply with this mandate, it necessarily follows

that either by a casual or by a careful reading of this Act one is led to the inescapable conclusion that teachers would receive the minimum salaries as set by the State Department of Education, plus additional amounts received by teachers for teaching during the year 1948-49 school term, using that term as a norm, over and above the minimum salary for that term.

It results that the judgment and decree of the Chancellor must be affirmed.