912 P.2d 9

## TUCSON ELECTRIC POWER COMPANY, an Arizona corporation, Plaintiff–Appellant,

v.

APACHE COUNTY, Cochise County, Coconino County, Graham County, Greenlee County, Maricopa County, Navajo County, Pima County, Pinal County, Santa Cruz County and Yavapai County, political subdivisions of the State of Arizona; the Arizona Department of Revenue, an agency of the State of Arizona; and the Treasurer of the State of Arizona, acting in his official capacity, Defendants–Appellees.

ARIZONA PUBLIC SERVICE COMPANY, an Arizona corporation; Salt River Project Agricultural Improvement and Power District, a political subdivision of the State of Arizona; El Paso Electric Company, a Texas corporation; the De-

**6**

partment of Water and Power of the City of Los Angeles, a California municipal corporation; Public Service Company of New Mexico, a New Mexico corporation; Southern California Edison Company, a California corporation; Southern California Public Power Authority, a California joint powers agency; Arizona Electrical Power Cooperative, Inc., an electric generation and transmission cooperative, Plaintiffs–Appellants,

v.

APACHE COUNTY, Cochise County, Maricopa County, Navajo County and Pinal County, political subdivisions of the State of Arizona; the Arizona Department of Revenue, an agency of the State of Arizona; and the Treasurer of the State of Arizona, acting in his official capacity, Defendants–Appellees.

No. 1 CA–TX 93–0015.

Court of Appeals of Arizona,
Division 1,
Department T.

Nov. 21, 1995.

Reconsideration Denied Jan. 31, 1996.

Fennemore Craig, P.C. by Timothy Berg, Paul J. Mooney, Kendis K. Muscheid, Phoenix, for Plaintiff–Appellant Tucson Electric Power Company.

Grant Woods, Attorney General by Michael F. Kempner, Gale L. Garriott, Tracy S. Essig, Assistant Attorneys General, Phoenix, for All Defendants–Appellees except Cochise County.

Alan K. Polley, Cochise County Attorney by John A. MacKinnon, Deputy County Attorney, Bisbee, for Defendant–Appellee Cochise County.

Gallagher & Kennedy, P.A. by Dean C. Short, II, Michael K. Kennedy, Helene S. Fenlon, Phoenix, for Plaintiff–Appellant Arizona Public Service Company et al.

Brown & Bain, P.A. by Stephen E. Lee, Edward P. Ballinger, Jr., Phoenix, for Plaintiff–Appellant El Paso Electric Company.

## OPINION

CONTRERAS, Presiding Judge.

In these consolidated actions, nine companies that own property in Arizona used for generating electricity ("the taxpayers") appeal from a judgment sustaining the constitutionality of the levy school finance imposed by Ariz.Rev.Stat.Ann. ("A.R.S.") section 15–992(B) (as amended by 1990 Ariz.Sess.Laws, 3d Sp.Sess., ch. 3, § 4). The taxpayers further contest the retroactivity of both this amendment, and an amendment to A.R.S. section 42–227(A), which raised the assessment percentage for class one (mining) and class two (utility) property from 25% to 30%. 1990 Ariz.Sess.Laws, 3d Sp.Sess., ch. 3, §§ 8, 62. The separate appeal of El Paso Electric Company ("El Paso") challenges the dismissal of its refund claim for its failure, while in Chapter 11 bankruptcy, to timely pay accruing Arizona real property taxes.

·The dispositive issues are these:

1. Whether A.R.S. section 15–992(B) (1990) violates the exemption, special legislation, or uniformity clauses of the Arizona Constitution, or the equal protection clauses of the United States and Arizona Constitutions;

2. Whether the tax court erred in holding that the 1990 amendments to A.R.S. sections 15–992(B) and 42–227(A)(1) and (2) applied retroactively to January 1, 1990; and

3. Whether the tax court's dismissal of El Paso's complaint during the pendency of its Chapter 11 bankruptcy proceeding violated the automatic stay provided by 11 U.S.C. § 362(a).

We have jurisdiction pursuant to A.R.S. section 12–2101(B).

### SUMMARY OF DECISION

Because of the complexity of the issues involved in this case and the length of the opinion, we summarize our holdings at the start. In this opinion, we hold unconstitutional, as a "special law," the 1990 amendment to A.R.S. section 15–992(B). We therefore do not address the taxpayers' additional constitutional challenges. Because the unconstitutional amendment is void, we conclude that of the predecessor statute, A.R.S. section 15–992(B) (1989), which included all assessed property in the class of taxpayers in those affected districts, is automatically revived. Although we apply our decision retroactively, we conclude that the taxpayers are entitled only to a partial refund of the taxes they paid. This partial refund is to be computed by the tax court on remand. Other classes of property need not be taxed retroactively under the 1989 statute.

Because we hold A.R.S. section 15–992(B) (1990) unconstitutional, we need not address whether the tax court properly held that the amendment applied retroactively to January 1, 1990. We find no error in the tax court's conclusion that A.R.S. section 42–227(A)(1) and (2) applied retroactively to January 1, 1990.

Finally, we hold that the tax court's dismissal of El Paso's claim for failure to pay a subsequently levied tax after it filed for

Chapter 11 bankruptcy violated the automatic stay required by 11 U.S.C. § 362(a).

## FACTS AND PROCEDURAL HISTORY

For a basic understanding of Arizona's existing school financing system, we turn to our supreme court's recent opinion in *Roosevelt Elementary School District # 66 v. Bishop,* 179 Ariz. 233, 877 P.2d 806 (1994):

The statutes create an educational funding formula. First, each district's base-level funding needs are determined by multiplying the number of students in the district by an arbitrary, state-wide dollar amount per pupil. A.R.S. § 15–943. The per-pupil amount appears to be unrelated to any minimum amount necessary for a basic education.

The formula then determines the districts' share of the base level. The required contribution by a district is derived by multiplying the district's total assessed property value by an arbitrary dollar figure that each district is to collect from property taxes. A.R.S. § 15–971(D). If a district's required contribution falls short of the predetermined base level, the state makes up the difference. *Id.* If the district's expected contribution exceeds the base level, the district is not entitled to any state "equalization assistance." *Id.*

Finally, any funding in excess of the equalized level must be raised through bonded indebtedness by the individual districts. These bonds are subject to voter approval because they must be repaid by increased property taxes. "Since bonds are outside the funding formula, a district's ability to pass bonds is based purely on property wealth and taxpayer willingness." The Joint Legislative Budget Committee's Staff, *K–12 Funding Formula Examples and Descriptions* 11 (1993). The amount of bonded indebtedness that a district may incur, however, is limited by its total assessed property valuation. A.R.S. § 15–1021.

*Id.* at 237, 877 P.2d at 810 (footnote omitted).

The "equalization assistance" to which the *Roosevelt* court referred is also affected by A.R.S. section 15–992. Beginning with its adoption in 1981, section 15–992 required counties to levy school district taxes annually on all property in any school district

in which additional amounts are required, which shall be at rates sufficient to provide the additional amounts. The taxes shall be added to and collected in the same manner as other county taxes on the property within the school district.

A.R.S. § 15–992, 1981 Ariz.Sess.Laws ch. 1, § 2, redesignated A.R.S. § 15–992(A) by 1989 Ariz.Sess.Laws ch. 312, § 3.

In 1989, the legislature adopted section 15–992(B), which required each county to levy an additional tax (the QTR tax) annually "on the property in each school district that is not eligible for equalization assistance as provided in section 15–971...." 1989 Ariz.Sess. Laws ch. 312, § 3. The amount of the levy was to be determined as the difference between (1) the hypothetical levy that would be produced by applying one quarter of the "qualifying tax rate" prescribed in section 15–971(B)[1] to the district's assessed valuation, augmented by voluntary contributions under A.R.S. section 48–241 *et seq.,*[2] and (2) the "additional" school district taxes levied under former section 15–992, now section 15–992(A). A.R.S. § 15–992(B) (1989). The proceeds of the levy were to be forwarded to the state treasurer for deposit in the state general fund. A.R.S. § 15–992(C) (1989).

In 1990, the legislature narrowed the applicability of the QTR tax. The tax provided by A.R.S. section 15–992(B) (1990) no longer applied to all property in school districts ineligible for equalization assistance. 1990 Ariz.Sess.Laws, 3d Sp.Sess., ch. 3, § 4. Rather, it now applied only to property in such districts classified by A.R.S. section 42–162 as class one (mining) or class two (utility)

---

1. $2.36 per $100 assessed valuation in high school districts and certain common school districts; $4.72 per $100 assessed valuation in unified school districts and certain common school districts.

2. The vehicle by which the Salt River Project, a nontaxable instrumentality of the United States, effectively pays Arizona *ad valorem* property taxes.

property, and property on which voluntary contributions were collected pursuant to A.R.S. section 48–241 *et seq.* A.R.S. § 15–992(B)(1), (2) (1990). The amount of this modified QTR tax was to be determined by reference to a hypothetical levy calculated by applying 65%[3] of the applicable qualifying tax rate under section 15–971(B) to the values of class one and two property in the district and the value used to determine voluntary contributions from property in the district. The 1990 amendment to A.R.S. section 15–992 was expressly made retroactive to January 1, 1990. 1990 Ariz.Sess.Laws, 3d Sp.Sess., ch. 3, § 62(B).

Section 8 of the amending legislation also amended A.R.S. section 42–227(A)(1) and (2) to raise the assessed valuation for mining and utility property from 25% to 30% for tax years 1990 and following. 1990 Ariz.Sess. Laws, 3d Sp.Sess., ch. 3, § 8. This, too, was expressly made retroactive to January 1, 1990. *Id.* at § 62(B).

In 1990 and 1991 only those non-state aid districts in which class one and two property accounted for a high proportion of the total assessed value of the district's tax base actually levied the QTR tax. In other such districts, where smaller percentages of the total assessed value of the tax base represented class one and two property, no property at all was subjected to the section 15–992(B) (1990) levy.[4]

The taxpayers brought actions seeking recovery of property taxes and voluntary contributions collected pursuant to A.R.S. section 15–992(B) (1990). The actions were consolidated. On cross-motions for summary judgment, the tax court ruled for the appellee counties and the state. The court later granted the state's motion to dismiss appellant El Paso's refund claim for lack of

subject matter jurisdiction.[5] From the tax court's formal judgment, the taxpayers timely appealed.

## ANALYSIS

### *Standards of Review*

 We presume that a statute is constitutional; thus, the party alleging a constitutional violation bears the burden of establishing such violation. *El Paso Natural Gas Co. v. Department of Revenue,* 174 Ariz. 470, 477, 851 P.2d 95, 102 (App.1992). That burden must be met by proof beyond a reasonable doubt. *McClead v. Pima County,* 174 Ariz. 348, 352, 849 P.2d 1378, 1382 (App. 1992).

 Because this case involves a question of law and undisputed facts, our review is *de novo. Norquip Rental Corp. v. Sky Steel Erectors, Inc.,* 175 Ariz. 199, 201, 854 P.2d 1185, 1188 (App.1993).

### *Constitutionality of 1990 Amendment to A.R.S. section 15–992(B)*

The Arizona Constitution provides: "No local or special law shall be enacted in any of the following cases, that is to say: ... (9) assessment and collection of taxes ... (13) granting to any corporation, association, or individual, any special or exclusive privileges, immunities or franchises ... (18) relinquishing any indebtedness, liability, or obligation to this state...." Ariz. Const. Art. 4, Part 2, § 19. On appeal, the taxpayers contend that A.R.S. section 15–992(B) (1990) constitutes an unconstitutional special law within one or more of these categories.

The taxpayers urge this court to give the question of special legislation due consideration on appeal, although, as they state in

---

3. Increasing to 75% for tax year 1991 and 85% for tax year 1992 and thereafter.

4. According to public records of the Department of Education and Arizona taxing districts, in 1990 twenty-five school districts levied less than the qualifying tax rate under A.R.S. section 15–971 and received no state equalization aid. Of these, only five were required to levy a QTR tax on class one and two property pursuant to A.R.S. section 15–992(B) (1990). Similarly, in 1991 only seven of twenty-four non-state aid districts

levied the QTR tax. In 1990 the average proportion of class one and two property to total valuation in the five districts that were required to levy a QTR tax was 94.4%, while that in non-state aid districts not required to do so was 25.4%. In 1991 the corresponding proportions were 91.9% and 20.0%, respectively.

5. On August 4, 1993, the tax court filed an opinion explaining its dismissal of El Paso's claim. *Arizona Public Service Co. v. Apache County,* 175 Ariz. 485, 857 P.2d 1339 (Tax 1993).

their written briefs, the issue "was not extensively briefed in the trial court." This cloudy characterization does not do justice to the record. In the tax court the taxpayers did not argue that A.R.S. section 15–992(B) (1990) constituted an invalid special law under the Arizona Constitution; they did not once cite Ariz. Const. Art. 4, Part 2, § 19. Their sole references to the term "special legislation" were limited to their incidental description of the holdings in two Nebraska decisions they cited in support of their distinct contention that A.R.S. section 15–992(B) (1990) violated Arizona's uniformity clause, Ariz. Const. Art. 9, § 1.

■ An appellant may generally not advance new theories on appeal to secure reversal of an adverse summary judgment. *Lansford v. Harris,* 174 Ariz. 413, 419, 850 P.2d 126, 132 (App.1992). We nevertheless have discretion to deviate from the general rule where the issue is of constitutional dimension, or is of general statewide importance. *Aldrich & Steinberger v. Martin,* 172 Ariz. 445, 447–48, 837 P.2d 1180, 1182–83 (App.1992); *In re Estates of Spear,* 173 Ariz. 565, 567, 845 P.2d 491, 493 (App.1992). Resolution of the constitutionality of A.R.S. section 15–992(B) (1990) is of statewide public importance. Moreover, though special law analysis and equal protection analysis overlap,[6] a statute that does not violate equal protection may still be an invalid special law. *Republic Inv. Fund I v. Town of Surprise,* 166 Ariz. 143, 148–49, 800 P.2d 1251, 1256–57 (1990). Additionally, no further factual record from the trial court is necessary for us to resolve this issue. Also, the parties have fully briefed the constitutional issues on appeal. Finally, our analysis *infra* resolves a significant part of this appeal. We therefore proceed to consider the taxpayers' special legislation contentions despite their failure to raise them below.

Preliminarily, appellees argue that A.R.S. section 15–992(B) (1990) does not constitute legislation in any of the prohibited areas cited by the taxpayers. *See* Ariz. Const. Art. 4, Part 2, § 19(9) (tax assessment or collection), (13) (granting special privileges), or (18) (relinquishing obligation to state). They argue the statute grants no special privileges, but rather imposes a tax on certain mines and utilities. They assert that the statute imposes rather than relinquishes an obligation owed to the state. They further contend that A.R.S. section 15–992(B) (1990) does not "assess" or "collect" a tax, but merely "levies" one.

We will assume, *arguendo,* that A.R.S. section 15–992(B) (1990) does not legislate within the subject matters covered by subsections 13 or 18 of Ariz. Const. Art. 4, Part 2, § 19. We disagree, however, that it is also outside subsection 9, concerning assessment or collection of taxes. Our supreme court has treated Ariz. Const. Art. 4, Part 2, § 19(9) as applicable to more than just those statutes that merely specify the means by which taxes already levied are to be assessed and collected.

■ For example, the Arizona Supreme Court invalidated a statute that temporarily exempted, from the state transaction privilege tax, retail sales of less than $1,000 to residents of Mexico legally present at points within 30 miles of the Mexican border. *State v. Levy's,* 119 Ariz. 191, 580 P.2d 329 (1978). This statute did not affect the means by which the transaction privilege tax was to be assessed or collected. Instead, it effectively suspended the levying of the transaction privilege tax on certain proceeds of the business of selling at retail to specified persons within a discrete geographic area. Relying on historical interpretation of a predecessor to Ariz. Const. Art. 4, Part 2, § 19(9), the *Levy's* court held that the prohibition against special or local laws respecting assessment and collection of taxes applied to tax exemptions. *Id.* at 193, 580 P.2d at 331. We conclude it also applies to statutes, like

---

6. Special legislation compliance and equal protection compliance share a similar element—the classification effected by the statute must, at the least, rationally further a legitimate state objective. *Compare State Compensation Fund v. Symington,* 174 Ariz. 188, 193, 848 P.2d 273, 278 (1993), and *Republic Inv. Fund I v. Town of Surprise,* 166 Ariz. 143, 149, 800 P.2d 1251, 1257 (1990), *with J.C. Penney Co. v. Department of Revenue,* 125 Ariz. 469, 472, 610 P.2d 471, 474 (App.1980).

A.R.S. section 15–992(B) (1990), that impose taxes.

■ Although we hold that A.R.S. section 15–992(B) (1990) legislates concerning "assessment and collection of taxes" within Ariz. Const. Art. 4, Part 2, § 19(9), it does not violate that provision unless it also constitutes a "special" or "local" law. To qualify as a general law as opposed to a special or local law, a statute must meet three criteria. First, the classification that it creates must have a rational basis. *Republic Inv. Fund I v. Town of Surprise*, 166 Ariz. 143, 149, 800 P.2d 1251, 1257 (1990). The judgment of the legislature that a statutory classification is reasonable controls the courts unless palpably arbitrary. *Chevron Chemical Co. v. Superior Court*, 131 Ariz. 431, 441, 641 P.2d 1275, 1285 (1982).

■ Second, the statute must "legitimately" classify by population, geography, or time limitations, or, stated differently, must encompass all members of the "relevant" class. Finally, the statutory class must be elastic, allowing members to move into or out of the class as their circumstances change. *Republic Inv. Fund I*, 166 Ariz. at 149, 800 P.2d at 1257. If the statute does not meet all three criteria, it is a special or local law. *State Compensation Fund v. Symington*, 174 Ariz. 188, 193, 848 P.2d 273, 278 (1993). A law may have limited application and still qualify as a general law if it satisfies the governing criteria. *Arizona Downs v. Arizona Horsemen's Foundation*, 130 Ariz. 550, 558, 637 P.2d 1053, 1061 (1981).

### A. *Rational Basis*

■ In practice, A.R.S. section 15–992(B) (1990) creates a dichotomy between mining and utility property, on the one hand, and on the other hand, all non-mining or non-utility property situated in school districts (1) that are ineligible for state equalization assistance, and (2) whose disproportionately high overall valuations result in substantially lower school district tax rates than the normal range of such rates within the state as a

whole. Appellees assert that the purpose of the tax is "to equalize the unusually low rates of property tax in a handful of school districts with the general prevailing tax rates in most Arizona school districts." They argue, in effect, that A.R.S. section 15–992(B) (1990) furthers this clearly rational goal by raising the *average* school district tax rates in the affected school districts closer to the normal range for such rates.

This reasoning might sustain the classification drawn by pre–1990 A.R.S. section 15–992(B) (1989) between property taxpayers in school districts with extremely high overall valuations and those everywhere else. It does not, however, even address the classification under attack here—between class one and two property taxpayers (mines and utilities) and all other property owners within such school districts.

Appellees further attempt to supply a rational basis for the classification by asserting that mines and utilities specially benefit from and specially burden society, and therefore may rationally be asked to pay a larger share of the costs of its operation. For example, they postulate that the very nature of mines and utilities is such that their "values comprise essentially all of the property value in certain districts." As a result, their "values have skewed the tax rate downward in those districts, when the presence of those properties have created more unfavorable living conditions and such properties are more able to distribute the impact of the tax than other property owners in the district." This "industrial body odor" on the district, appellees contend, justifies the legislature's imposition of QTR taxes solely on class one and class two properties in those districts.

This attempt fails. Appellees have given some valid examples of this effect, but have not established this to be a valid generalization that applies either to *all* utilities and mines, nor established that it does not apply to *other* industrial and commercial entities that may exist within these districts as well.[7] Furthermore, they have not addressed other factors that defeat their own premise; for

7. For example, other known generators of "industrial body odor" such as airports, railroads, hospitals, etc., are exempt from the QTR tax by

virtue of the operation of A.R.S. section 15–992(B) (1990).

example, the development of mines and utilities in unpopulated areas may tend to bring people, housing, and employment to those areas, thus increasing property values in the entire district. We find no basis to speculate that mines and utilities necessarily "burden" these districts in a way that no other class of property does.

The real issue here is not whether there is a rational basis for imposing property tax rates on mines and utilities that are roughly equivalent to the state norm. The pertinent issue instead is whether a rational basis exists for insulating similarly situated owners of non-mining and non-utility property from the imposition of such rates. Appellees have, in our opinion, failed to provide us with any rational basis for the legislature to make this distinction and apply it solely to class one and class two properties, effectively favoring non-utility and non-mining property of all types.

A school district's property tax rate varies inversely with the total valuation of all non-exempt property in the district. Only one such rate is calculated. That single rate applies to the assessed valuation of every taxable parcel in the district. If the overall valuation of the district's property is disproportionately high in comparison to the school district's actual financial needs, so that the school district's property tax rate is far below the norm for the state, every taxable parcel in the district is similarly favored. We find no special "benefit" that accrues to utilities and mines alone that would justify this disfavored status.

We also reject appellees' reliance on the assertion that "it was the values of those Class 1 and 2 properties, not the values of the other properties, that created the low tax rates in those school districts [affected by the A.R.S. § 15–992(B) (1990) tax]." The implication from this assertion is that class one and two properties were at "fault" for the inequity, and should thus bear the entire burden of ameliorating it. Appellees cite no factual or legal authority that supports this proposition. Their view also ignores the undeniable fact that all property in the affected districts, not just class one and two property, benefitted proportionally from the "evil"— bargain-basement school tax rates—that the legislation ostensibly sought to remedy.

■ Appellees also assert, as a rational basis, that "[m]ines and utilities can pass on the tax through market prices or rate increases; homeowners, by contrast, cannot. Taxing all property could have a double effect on residential and commercial property by forcing them to pay their own increase plus the utilities rate increase for their tax which was passed on." We recognize that a legislative classification can be based on rational speculation unsupported by evidence, *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993), but this goes too far. The speculation must at least be rational. Here we deal with a statutory line drawn between mining and utility property, on the one hand, and all other classes of property on the other, for the purpose of equalizing taxpayers' contributions to education statewide. Non-mining and non-utility properties include not only homeowners and small businesses, but enterprises and farms of all sizes, apartments, hospitals, railroads, flight property, historic property, manufacturing property, and leaseholds in public property. *See generally* A.R.S. § 42–162. The presumed ability of mines and utilities to pass real property taxes through to their customers does not genuinely distinguish them from most taxpayers owning other classes of property.

The classification created by A.R.S. section 15–992(B) (1990) is no more based on reason than the classification declared invalid in *State Compensation Fund v. Symington*, 174 Ariz. 188, 848 P.2d 273 (1993). In that case, House Bill 2001 levied on the State Compensation Fund a minimum annual income tax of $500,000, while at the same time taxing all other workers' compensation carriers in accordance with their actual taxable income. The court held House Bill 2001 a special law invalid under Ariz. Const. Art. 4, Part 2, § 19(9):

The alternative minimum tax was enacted to help balance the state budget and to "level the playing field" by eliminating the "special privilege" that the Fund has over private workers' compensation carriers as a result of its federal tax exemption. . . .

The parties do not dispute that these are legitimate legislative goals.

We next consider whether the classification drawn by the legislature is rationally related to achieving the legitimate legislative goals. The classification distinguishes between the Fund on one hand and all other workers' compensation carriers on the other. "We will uphold the classification if there exists any set of facts under which the classification rationally furthers a legitimate legislative purpose." *Eastin [v. Broomfield],* 116 Ariz. [576] at 583, 570 P.2d [744] at 751 [1977].

It is clear that the $500,000 alternative minimum tax was imposed only on the Fund because it is a "state agency," and the legislature believed that the Fund's assets were available to help balance the budget. No private carriers are subject to this minimum tax. The state argues that because the Fund is a state agency it is reasonable to classify it differently than private carriers for the purpose of imposing the alternative minimum tax and that the classification is reasonable because it defeats the economic advantage enjoyed by the Fund as a result of its federal tax exemption.

We find, however, that the discriminatory imposition of the alternative minimum tax does not rationally further the goal of balancing the budget or equalizing the economic disparity between the Fund and private carriers.

. . . .

. . . The principal benefit enjoyed by the Fund as a "state agency" is its federal tax exempt status. We do not find this distinction a legitimate basis upon which to impose a mandatory minimum tax solely on the Fund. In all other respects the Fund is *no different than the private carriers.*

We also find that the alternative minimum tax does not *rationally* further the purpose of levelling the playing field because it imposes a mandatory flat tax, payable regardless of the amount of federal tax that would have been owed if the Fund were a private carrier. It does not account for the possibility that the Fund, if it were a private carrier, might owe no federal taxes in a given year or might owe some amount less than $500,000 in a given year. Regardless, the Fund, under the Act, is required to pay a minimum of $500,000 annually.

174 Ariz. at 193–94, 848 P.2d at 278–79 (emphasis in original).

The situation here is analogous. To correct school district tax rate inequities that arise in many districts as compared to the statewide normal range for such rates, A.R.S. section 15–992(B) (1990) imposes a compensating tax levy in a relatively small proportion of such districts, and then only on mining and utility properties in those districts. Like the State Compensation Fund, which was subjected to the alternative minimum tax because it alone among workers' compensation carriers was perceived as a "state agency," the mine and utility taxpayers here are subjected to the A.R.S. section 15–992(B) (1990) tax because they are perceived as more economically-suited to absorb it. Protecting non-mining and non-utility taxpayers from the tax does not rationally further the state's tax equalization purpose. It actually hinders that purpose.

Viewed with reference to the claimed purpose of A.R.S. section 15–992(B) (1990), no rational basis thus appears for permitting owners of non-mining and non-utility property to retain the benefit of the inequitably low school district tax rate. Appellees suggest no set of facts the legislature might have conceived that would rationally support sparing non-mining and non-utility property from a state tax aimed at eliminating the inequity, and imposing that tax only on property in classes one and two. We can conceive of none either. The classification cannot reasonably be viewed as furthering any legitimate state interest. Indeed, it furthers no articulable legislative policy at all. Accordingly, we find it is palpably arbitrary. We conclude that A.R.S. section 15–992(B) (1990) constitutes an invalid special law, because the classification it creates lacks any permissible rational basis and does not rationally further a legitimate state interest.

### B. *Members of the Relevant Class*

■ We also conclude that the classification drawn by A.R.S. section 15–992(B) (1990) does not legitimately encompass all members of the "relevant" class. Appellees' own argument in support of the contrary proposition demonstrates this unequivocally. They assert that mining and utility property in the affected school districts represents an average of 97.6% of the primary assessed value of those districts. They contend, "An analysis of the assessed valuation in each of the affected school districts shows that A.R.S. section 15–992(B) *encompassed all of the relevant members of the class* because it is Class 1 and 2 properties that account for *virtually all* of the property valuation in those districts." (Emphasis added.) Given the tax rate equalization purpose appellees claim for A.R.S. section 15–992(B) (1990), however, the relevant class is "all" property in the affected districts, not "virtually" all of it. The classification plainly does not encompass all members of the relevant class, but clearly favors the average 2.4% excluded from its operation.

### C. *Elasticity of the Class*

Because we have found no rational basis for A.R.S. section 15–992(B) (1990) and have concluded that it does not include all members of the relevant class, we need not address the elasticity of the statutory class. However, we find it self-evident that utilities and mines generally do not move easily in and out of school districts as tax circumstances change.

We conclude that A.R.S. section 15–992(B) (1990) constitutes an unconstitutional special law in violation of Ariz. Const. Art. 4, Part 2, § 19(9). Because we so hold, we need not consider the taxpayers' alternative challenges based on the Arizona Constitution's equal protection, uniformity, and exemption clauses, Ariz. Const. Art. 2, § 13, and Art. 9, §§ 1, 2, 2.1, 2.2.

### *Constitutionality of Applying Section 42–227(A)(1) and (2) Amendments Retroactively to January 1, 1990*

■ We have held A.R.S. section 15–992(B) (1990) an invalid special law, and need not decide whether applying it retroactively to January 1, 1990, entailed any further constitutional violation. However, the 1990 increases in the assessment percentages for class one and class two property were also made retroactive to January 1, 1990. *See* A.R.S. § 42–227(A)(1) and (2), as amended by 1990 Ariz.Sess.Laws, 3d Sp.Sess., ch. 3, §§ 8, 62 (raising assessment percentages from 25% to 30% of full cash value effective January 1, 1990). The amendments to A.R.S. section 42–227(A)(1) and (2) stand independent from the 1990 amendment to A.R.S. section 15–992(B). We therefore address the taxpayers' contention that the increase in the assessment percentages could not apply retroactively to the 1990 tax year.

We assume, without deciding, that the Act adopting the 1990 amendments to A.R.S. section 42–227(A)(1) and (2) did not become effective immediately upon its signing by the Governor on July 2, 1990, but instead on September 27, 1990, the ninety-first day following the legislature's adjournment *sine die* on June 28, 1990. *See generally* Ariz. Const. Art. 4, Part 1, § 1(3). The question remains whether that portion of the Act that made the amendments effective retroactively to January 1, 1990, impaired vested substantive rights of the taxpayers in violation of the due process clauses of the United States and Arizona Constitutions.

The taxpayers assert that it did. They point out that A.R.S. section 42–304(B) requires the governing body of each taxing entity annually to fix, levy and assess the amount to be raised by primary and secondary property taxation and to determine the applicable property tax rates accordingly, on the third Monday in August. They contend that each taxpayer's rights in the amount of such taxes become vested as of that date. The taxpayers contend that because the amendment that increased the assessment percentage for mining and utility property from 25% to 30% did not become effective until September 27, 1990, after property taxes for 1990 had been or should have been levied and assessed, the computation of their 1990 taxes based on the increased percentage impaired their vested rights in the lower amounts assessed in August 1990.

Two decisions of the Arizona Supreme Court render this contention untenable. In *Maricopa County v. Garfield,* 109 Ariz. 503, 513 P.2d 932 (1973), Maricopa County levied and assessed property taxes based on an incorrectly high property valuation total. On discovery of the error, it lowered the property tax rate on September 4, 1973. The State Treasurer declined to accept the revised rate on the ground that it had been set too late. On special action the supreme court held that the levy and assessment deadline of A.R.S. section 42–304(B) was merely directory:

> While there may be instances when a substantial delay in fixing the tax rate may actually interfere with taxpayers' rights, such as the right to appeal the assessment, the delay in this case did not affect the rights of taxpayers, and there was substantial time left within which the administrative process provided by statute could be completed. Since the action of the Board in this case did not adversely affect the rights of anyone, we hold that the action of the Board of Supervisors in revising the tax rate was valid and lawful, and the State Treasurer is directed to accept the September 4, 1973 figures and report of the Board as the correct amount of the property tax reduction figure for Maricopa County.

*Garfield,* 109 Ariz. at 504, 513 P.2d at 933. It is plain from *Garfield* that the third Monday in August has, of itself, no constitutional significance.

More recently, the supreme court clarified the test for determining whether a given legal right is "vested," so that it cannot be retroactively impaired consistently with due process:

> We believe that a right vests only when it is actually assertable as a legal cause of action or defense or is so substantially relied upon that retroactive divestiture would be manifestly unjust. The defense of contributory negligence, while a substantive right, does not vest until a lawsuit has been filed. Prior to that time it is merely an inchoate right which cannot be asserted "until the happening of some fu-

ture event." *See Steinfeld v. Nielsen,* 15 Ariz. [424] at 465, 139 P. [879] at 896 [ (1913) ].

*Hall v. A.N.R. Freight System, Inc.,* 149 Ariz. 130, 140, 717 P.2d 434, 444 (1986).

The taxpayers assert that the final levy and assessment of taxes in August of 1990 gave them vested rights in the particular tax liabilities that could be calculated at that time. Though they cite *Hall v. A.N.R. Freight System, Inc.,* they do not actually apply the standard it adopts to support their position. Their claimed rights actually fail the *Hall* vesting test. No litigation was pending as of the third Monday in August, 1990, nor was any commenced before September 27, 1990, in which the taxpayers could have asserted the precise amounts of their property taxes as claims or defenses. Further, the record contains no evidence that any of the taxpayers relied on those amounts to any extent, much less substantially enough that the retroactive alteration of those amounts was manifestly unjust. We therefore conclude that the tax court did not err in applying the increased assessment percentages of A.R.S. sections 42–227(A)(1) and (2) (1990) retroactively to January 1, 1990.[8]

### Tax Court's Dismissal of El Paso Electric's Complaint During Chapter 11 Proceedings for Failure to Pay Accruing Taxes

Taxpayer El Paso was one of a number of taxpayer utilities that joined in challenging the constitutionality of the tax imposed by A.R.S. section 15–992(B) (1990). El Paso's complaint sought return of the amounts collected as property taxes for tax years 1990 and 1991. Slightly more than a year after El Paso filed its complaint, it commenced a proceeding in the Western District of Texas under Chapter 11 of the United States Bankruptcy Code.

El Paso thereafter failed to pay its Maricopa County property taxes for the second half of 1991 before they became delinquent on May 1, 1992. Appellees moved to dismiss El

---

8. As a practical matter, however, in light of our discussion regarding the remedy in this case, *infra,* this holding will not affect the amount of the refund due appellants.

Paso's action pursuant to A.R.S. section 42–204(A):

> A. Any person upon whom a tax has been imposed or levied under any law relating to taxation shall not be permitted to test the validity or amount of tax, either as plaintiff or defendant, if any of the taxes:
>
> 1. levied and assessed in previous years against the property of the taxpayer have not been paid.
>
> 2. which are the subject of the action are not paid prior to becoming delinquent.
>
> 3. *becoming due on the property during the pendency of the action are not paid prior to becoming delinquent.*

(Emphasis added). Citing *Pima County v. Cyprus–Pima Mining Co.,* 119 Ariz. 111, 579 P.2d 1081 (1978), appellees asserted that El Paso's failure to pay its second half taxes deprived the court of subject-matter jurisdiction over its property tax challenges for 1990 and 1991.

El Paso opposed the motion on the theory that the pendency of its Chapter 11 bankruptcy proceeding stayed its obligation to pay the second half taxes pursuant to 11 U.S.C. § 362(a). Under that statute, the filing of any petition in bankruptcy automatically stays:

> (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;
>
> . . . .
>
> (3) any acts to obtain possession of property of the estate or property from the state or to exercise control over property of the estate;
>
> . . . .
>
> (6) any acts to collect, assess or recover a claim against the debtor that arose before the commencement of the case under this title. . . .

9. Repealed by 1994 Ariz.Sess.Laws ch. 287, § 3.

11 U.S.C. § 362(a). In reply, appellees noted that El Paso, not appellees, filed the instant action. Appellees argued that by moving to dismiss El Paso's action they were not continuing or commencing any action against El Paso or trying to recover a pre-bankruptcy claim. They argued they were merely exercising their defensive legal rights under state law.

The tax court granted the motion to dismiss the action as to El Paso. It later filed a written opinion pursuant to former A.R.S. section 12–171 [9] explaining its reasons. *Arizona Public Service Co. v. Apache County,* 175 Ariz. 485, 857 P.2d 1339 (Tax 1993). The tax court stated:

> The stay prevents creditors from suing the bankrupt or moving against the bankrupt's property. None of the subsections to § 362(a) say anything about staying a creditor from protecting itself against action by the bankrupt.
>
> . . . .
>
> The state threatened no penalty in this case and they did not make an effort to collect the 1990 taxes from El Paso—they were paid some time ago. The only action the state took is a defensive one to protect itself. That does not violate 362(a)(1), (3) or (6).
>
> The bankruptcy code, 11 U.S.C. § 362(a)(1), (3) and (6), does not prevent a state (or county) to whom property taxes are owed from filing a motion to dismiss a suit filed by the bankrupt taxpayer to declare the taxes illegally assessed.

175 Ariz. at 486–87, 857 P.2d at 1340–41. On appeal El Paso contends the tax court erred. We agree.

Appellees do not dispute that the property taxes in question here were governmental claims against El Paso's property that arose before El Paso commenced Chapter 11 proceedings. Like all property taxes, they were imposed against El Paso's property by operation of law. In our opinion, this governmental claim effectively began an "administrative or other action or proceeding against" El Paso to recover on these pre-petition claims. 11 U.S.C. § 362(a)(1).

If El Paso had failed to pay those taxes, its property would have been subject to involuntary sale to satisfy them. *See* A.R.S. § 42–381 *et seq.* Accordingly, if El Paso desired to resist the process previously commenced by law to collect property taxes on its property, it had no choice but to pay them under protest and file an action against appellees seeking their return. *See generally* A.R.S. §§ 42–177, 42–204. Contrary to the tax court's analysis, El Paso's doing so was not the legal equivalent of initiating a legal action to recover a claim that arose on El Paso's behalf *ab initio.* It was instead El Paso's only available defensive procedure against the governmental property tax collection process.

When the process is thus assessed by considering substance over form, it becomes clear that appellees' filing their motion to dismiss El Paso's complaint was not a purely defensive action to protect themselves, as the tax court concluded. It was a continuation of the long-pending process by which appellees, as required by statute, sought to collect property taxes on El Paso's property. Because this action was undertaken after El Paso commenced bankruptcy proceedings, it violated 11 U.S.C. § 362(a)(1). Thus, the tax court's dismissal of El Paso from the action was void as a matter of federal law. *See In re Schwartz,* 954 F.2d 569 (9th Cir.1992).

The United States Bankruptcy Court for the District of Arizona has arrived at the same conclusion under closely similar facts. *See In re General Associated Investors Ltd. Partnership,* 159 B.R. 551 (D.Ariz.1993). In *General Associated Investors,* the taxpayer filed a Chapter 11 bankruptcy petition after commencing a property tax appeal in the tax court. When the taxpayer thereafter failed to pay accruing property taxes before they became delinquent, the Arizona taxing authorities moved to dismiss their tax court action. The taxpayer applied to the bankruptcy court for an order to show cause for contempt, alleging a violation of the automatic stay. The bankruptcy court ruled for the taxpayer, holding that the motion to dismiss constituted "the continuation of proceedings against the Debtor in which the Debtor initiated the action." 159 B.R. at 556. The

bankruptcy court criticized the tax court's published opinion in the present case as "not properly reasoned." *Id.*

Appellees place primary reliance on *Freeman v. Commissioner of Internal Revenue,* 799 F.2d 1091 (5th Cir.1986), and other federal appellate cases they cite for resolution of the question whether the "proceeding" sought to be stayed was "against the debtor" by examination of the proceeding's formal posture when it commenced. In our opinion, *Freeman* unreasonably restricts the meaning of "proceeding" within 11 U.S.C. § 362(a)(1). In *Freeman,* the taxpayers brought an action in the United States Tax Court for a redetermination of their income tax liability. After the tax court dismissed their action, the taxpayers appealed the dismissal, and thereafter commenced a Chapter 11 proceeding. In the Fifth Circuit, the taxpayers moved for an order vacating the Tax Court's dismissal, citing 11 U.S.C. § 362(a)(1). The court denied the motion, holding that the taxpayers had commenced the Tax Court action, and it therefore was not subject to the automatic stay. 779 F.2d at 1093.

*Freeman* has been criticized by *Delpit v. Commissioner of Internal Revenue,* 18 F.3d 768 (9th Cir.1994). *Delpit* held that a taxpayer's appeal from an adverse judgment of the United States Tax Court was automatically stayed by the commencement of bankruptcy proceedings. The Ninth Circuit characterized *Freeman's* reasoning as "faulty:"

A taxpayer is barred from filing a petition in Tax Court unless the IRS has *already* instituted extensive administrative proceedings "against" him (e.g., audit, meeting, 30–day letter, appeals board, 90–day Notice of Deficiency, etc.). Accordingly, an appeal from a Tax Court judgment is indeed a "continuation" of an action or proceeding "against the debtor" within the meaning of Section 362(a)(1).... The mere fact that a debtor "initiates" an action in Tax Court is not dispositive; we must examine the proceedings as a whole to determine whether they are in fact initiated "against the debtor." *See In re Bloom,* 875 F.2d 224, 226 (9th Cir.1989) (holding that a motion by a creditor to strike a pre-bankruptcy action violates the

automatic stay even though the debtor initiated the proceeding and was the plaintiff). Otherwise, declaratory judgments and state-court proceedings initiated by the debtor to resolve disputes over tax liability would never be subject to the automatic stay.

*Id.* 18 F.3d at 772–73 (emphasis in original). *See also In re Elsinore Shore Associates,* 66 B.R. 723 (D.N.J.1986) (requiring debtor to pay pre-petition license fees and taxes as a condition of casino relicensure violated automatic stay; effect of proceeding, however labeled, was to compel the debtor to pay pre-petition fees and taxes).

The remaining decisions on which appellees rely are distinguishable. *See Martin–Trigona v. Champion Federal Sav. & Loan Ass'n,* 892 F.2d 575 (7th Cir.1989); *Brown v. Armstrong,* 949 F.2d 1007 (8th Cir.1991); *Carley Capital Group v. Fireman's Fund Ins. Co.,* 889 F.2d 1126 (D.C.Cir.1989); and *In re Berry Estates, Inc.,* 812 F.2d 67 (2d Cir.), *cert. denied,* 484 U.S. 819, 108 S.Ct. 77, 98 L.Ed.2d 40 (1987). These cases all concerned litigated disputes actually initiated by the debtor, and not in response to earlier collection or assessment proceedings or actions by the putative defendants. Appellees' remaining cases held only that an appeal by the debtor in an action originally commenced by the creditor was subject to the automatic stay. *See Cathey v. Johns–Manville Sales Corp.,* 711 F.2d 60 (6th Cir.1983); *Association of St. Croix Condominium Owners v. St. Croix Hotel Corp.,* 682 F.2d 446 (3d Cir. 1982).

In view of our holding that appellees' motion to dismiss violated 11 U.S.C. § 362(a)(1), we need not consider whether appellees thereby also improperly "exercised control" over property of the El Paso bankruptcy estate. El Paso's claim must be reinstated on remand, subject to the legal effect of any developments in the bankruptcy action or otherwise that are not revealed by the record on this appeal.

### Prospective or Retroactive Holding

▆▆▆▆ Appellees argue that if this court finds A.R.S. section 15–992(B) (1990) invalid, we should so declare prospectively only, and deny the taxpayers any refunds. We reject this argument. An appellate court opinion is presumed to operate retroactively. *Chevron Chem. Co. v. Superior Court,* 131 Ariz. 431, 435, 641 P.2d 1275, 1279 (1982). Generally, this presumption may be overcome through a balancing of the following factors: (1) whether the opinion establishes a new legal principle by overruling clear and reliable precedent or by deciding an issue whose resolution was not foreshadowed; (2) whether retroactive application would further or retard operation of the rule in question considering the prior history, purpose, and effect of the rule; and (3) whether retroactive application would produce substantially inequitable results. *Wilderness World, Inc. v. Department of Revenue,* 182 Ariz. 196, 201, 895 P.2d 108, 113 (1995); *Fain Land & Cattle Co. v. Hassell,* 163 Ariz. 587, 596–97, 790 P.2d 242, 251–52 (1990).

The constitutionality of A.R.S. section 15–992(B) (1990) is an issue of first impression. We overrule no clear and reliable precedent. Further, we decided that issue on a rationale that was not unsurprising given the well-known special law provisions of the Arizona Constitution necessarily implicated by the statute and the taxpayers' challenge.

Appellees do not suggest how retroactive application of our holding would retard the operation of that rule or otherwise be inconsistent with it. Moreover, we find it difficult to conceive how requiring the state and the affected counties to refund the proceeds of an illegal tax to those who paid it under protest could be viewed as "substantially inequitable." *See, e.g., Pittsburgh & Midway Coal Mining Co. v. Department of Revenue,* 161 Ariz. 135, 138–39, 776 P.2d 1061, 1064–65 (1989) ("An honorable government would not keep taxes to which it is not entitled, and the legislative scheme supports that result"). It was the legislature, not these taxpayers, which determined to narrow the reach of the 1989 version of A.R.S. section 15–992(B). Finally, this is not a case in which there is any indication that the granting of refunds would "threaten the financial solvency of many taxing units of the state...." *See Southern Pacific Co. v. Cochise County,* 92 Ariz. 395, 406, 377 P.2d 770 (1963).

In *Southern Pacific*, the Arizona Supreme Court applied prospectively a decision invalidating a tax law "where great hardship will result if caused from long continued failure to exert a legal right." 92 Ariz. 395, 406, 377 P.2d 770 (1963). In this case, unlike in *Southern Pacific*, the taxpayers promptly challenged the constitutional validity of the law shortly after its effective date, and no showing has been made on this record that their claim will economically devastate the educational system of this state. Additionally, the *Southern Pacific* court relied on the common law rules that "[p]ublic policy discourages suits for the refund of taxes even where illegally collected," and "the refund of taxes paid is by virtue of governmental grace rather than by reason of any legal right which the taxpayer has to such a refund." *Id.* As the taxpayers point out, however, the refund of taxes illegally paid is now a statutory obligation. *See* A.R.S. § 42–204(C) ("if the tax due is determined to be less than the amount paid, the excess shall be refunded in the manner provided by this title"). Furthermore, these latter common law principles may no longer be valid under more recent federal constitutional cases.

Since *Southern Pacific* was decided, a considerable body of case law has been generated regarding a taxpayer's constitutional right to a refund of taxes paid under protest when a tax statute is declared invalid. *See generally* David F. Shores, *Recovery of Unconstitutional Taxes: A New Approach*, 12 Va.Tax Rev. 167 (Fall 1992).

■ One case in particular seems relevant to the retroactivity question. *See McKesson Corp. v. Division of Alcoholic Beverages & Tobacco*, 496 U.S. 18, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990). In *McKesson*, the United States Supreme Court held that when an unconstitutional tax is paid "under duress,"[10] the due process clause of the

United States Constitution requires retroactive relief:

> [I]f a state places a taxpayer under duress promptly to pay a tax when due and relegates him to a post-payment refund action in which he can challenge the tax's legality, the Due Process Clause of the Fourteenth Amendment obligates the state to provide meaningful backward-looking relief to rectify any unconstitutional deprivation.

496 U.S. at 31, 110 S.Ct. at 2247. Thus, it appears that retroactive application, as a matter of federal constitutional law, is required in this case where the taxes at issue were paid under protest, regardless of our non-tax cases that consider retroactivity a "policy question within the court's discretion." *See, e.g., Fain*, 163 Ariz. at 596, 790 P.2d at 251. The Arizona Supreme Court has also recently acknowledged, in a tax case, "It is not the common practice, where the court finds a tax has been improperly imposed, to give a decision prospective effect only." *Wilderness World, Inc. v. Department of Revenue*, 182 Ariz. 196, 201, 895 P.2d 108, 113 (1995).[11]

Based on the above-cited law, we apply this decision retroactively. We also reject appellees' contention that the taxpayers suffered no "discrimination" because they would have paid more if A.R.S. section 15–992(B) (1990) had applied to all classes of property. As the taxpayers point out, appellees' assertion is predicated on the assumption that the legislature would have chosen exactly the same formula for calculating the A.R.S. section 15–992(B) (1990) tax if it had applied that tax to all classes of property in the affected districts. This assumption is both speculative and unverifiable. Moreover, the material inquiry is not whether the taxpayers would have been financially better off if a different taxing statute had been adopted. The question is whether the statute that imposed the tax they paid under protest was

---

10. The *McKesson* Court used the term "duress" to apply to taxes paid under protest, when "a State penalizes taxpayers for failure to remit their taxes in timely fashion, thus requiring them to pay first and obtain review of the tax's validity later in a refund action...." 496 U.S. at 22, 110 S.Ct. at 2242. The taxes involved in this appeal were paid under protest, pursuant to A.R.S. section 42–204(B).

11. In *Wilderness World*, where the taxes involved were paid under protest, the supreme court did not address the due process implications of a prospective application of its decision, but simply applied the *Fain* three-prong balancing test to conclude that the decision should have retroactive application.

valid under the Arizona Constitution. We have held that it was not. No further inquiry is necessary.

### Effect of the Unconstitutional Statute

We now face the issue of the effect of our retroactive holding that A.R.S. section 15–992(B) (1990) is unconstitutional as a special law. The parties did not address this question in their initial briefing, other than to approach it from the perspective of whether this court's decision should be applied retroactively or prospectively. Because appellees contended at oral argument that the potential ramification of such a decision would be the state's loss of the entire amount of QTR taxes collected from 1990 to the present,[12] we ordered the parties to submit simultaneous supplemental briefs regarding the remedies question. In the supplemental brief, appellees contend that the state will lose in excess of $550 million in educational funds as a result of our decision.

■■■ We note that the question whether a decision of unconstitutionality should apply retroactively is separate from the question of what remedy is appropriate to cure the injury from the constitutional violation. The United States Supreme Court recognized in *McKesson* and other cases that, although the retroactivity issue in the context of an unconstitutional tax provision paid under duress may be a question of federal constitutional law, that question is separate and distinct from the remedial question of what relief to afford the taxpayers, which is a matter of state law. *See McKesson*, 496 U.S. at 51, 110 S.Ct. at 2258 (state may consider administrative costs when "choosing between the various avenues of relief open to it"); *American Trucking Assn's v. Smith*, 496 U.S. 167, 178, 110 S.Ct. 2323, 2330–31, 110 L.Ed.2d 148 (1990) (once retroactivity is determined as a matter of federal law, state court determines the remedial issue). The remedy is not constitutionally limited to a total refund of the taxes paid under an unconstitutional statute. *McKesson*, 496 U.S. at 51, 110 S.Ct. at 2258.

### A. Automatic Revival of Predecessor Statute

■■■ One remedial theory applied by state courts when a statute is retroactively declared unconstitutional, in both the tax context and otherwise, is automatic revival of the predecessor statute.[13] In this case, we must examine whether our invalidation of A.R.S. section 15–992(B) (1990) effectively revives former A.R.S. section 15–992(B) (1989) to operate in full force and effect from the effective date of the invalid amendment. We conclude that it does.

■■■ Initially, we presume that, by amending a statute, the legislature intended to change existing law. *See State v. Garza*

---

12. Appellees contended at oral argument that the result of our holding A.R.S. section 15–992(B) (1990) unconstitutional would be a refund of all the QTR tax paid in all tax years since 1990. We note that this case involves only tax years 1990 and 1991 and only the taxpayers who are parties to this appeal, although the parties concede that other protests based on the same challenge are pending for the subsequent tax years. The state also alleges that QTR taxes of approximately $100 million per tax year were accruing while this case was pending.

Appellees did not initially brief the availability of a partial refund as a potential remedy, despite recent Arizona Tax Court decisions that utilized this relief. *See Bohn v. Waddell*, 164 Ariz. 74, 790 P.2d 772 (Tax 1990) and supp. op., 167 Ariz. 344, 807 P.2d 1 (Tax 1991), both *vacated on other grounds*, 174 Ariz. 239, 848 P.2d 324 (App.1992). Although the *Bohn* tax court cases are not precedential, they do indicate a remedy preferable to appellees' assertion in their responding brief that "Appellants are *not* entitled *to* a refund because

the remedy would be to tax all other classes of property, not refund money Appellants would have paid anyway...."

13. As a preliminary matter, we reject appellees' argument, made for the first time in the supplemental brief, that the offending language of A.R.S. section 15–992(B) (1990) applying the QTR tax only to classes one and two can be "severed," leaving the 1990 statute intact. As a practical matter, deletion of the "offending language" leaves the statute as it was before its amendment. The state contends that the 1990 statute, as severed, "would provide more revenue for state aid to education." In light of our refund computation, discussed *infra*, the amount would be the same.

We believe it is the function of the legislature, not this court, to enact a proper amendment to a statute. By reviving the 1989 statute, we leave it to the legislature to make whatever changes it requires to adjust the QTR tax to meet the current educational needs of this state.

*Rodriguez,* 164 Ariz. 107, 111, 791 P.2d 633, 637 (1990). It has long been recognized that an amendment of a statute, covering the same subject matter, implicitly repeals the earlier version. *Olson v. State,* 36 Ariz. 294, 296–97, 285 P. 282 (1930). However, when a law that repeals a former law is found to be unconstitutional, and therefore void, the operative repeal of the former constitutional law also falls, with the effect that the prior version of the amending statute is automatically reinstated by operation of law:

> Where the clause containing the repeal is incidental to the rest of the statute, and the latter is invalid, the clause containing the repeal will likewise be deemed invalid, leaving the prior law in full force and effect.

*Selective Life Ins. Co. v. Equitable Life Assurance Society,* 101 Ariz. 594, 601, 422 P.2d 710, 718 (1967).

One of the authorities cited in *Selective Life* states this rule as follows:

> The rule is general that an unconstitutional amendment to a valid statute is of no effect, the statute being left in force just as though the amendment had not been enacted.[14] An unconstitutional statute seeking to repeal a statute is also ineffective, if it can be said that the legislature meant to leave the prior act in force if the new one were declared invalid. An invalid repealing act does repeal a prior valid statute, however, if it is shown to the satisfaction of the court that the legislature meant to repeal it in any event and meant the new statute to be a complete substitute for the old one.

Oliver P. Field, *The Effect of an Unconstitutional Statute* 283–84 (1935). This rule does not require that the "repeal" be expressed in the amending statute. *Id.* at 284–85; *see also* 1 Sutherland, *Statutory Construction,* § 2033 at 508 (3d ed. 1943) and 1A Sutherland, *Statutory Construction,* § 23.24 at 403–04 (5th ed. 1993) ("A legislative enactment which is unconstitutional cannot repeal by implication a prior statute, since a judicial declaration of invalidity eliminates the con-

flict which is the essential element of the repeal").

Several criteria must be met for application of this rule. First, the evident purpose of the unconstitutional amendment must be to displace the old law and substitute for it. *See Missouri Ins. Co. v. Morris,* 255 S.W.2d 781, 782–83 (Mo.1953). When the legislature provides two enactments in all respects identical except for the amending language found invalid, this is a good indication that substitution was the intent. *Id.* at 782. Second, it must appear that the legislature would not have passed the amendment if its invalidity would have left a "hiatus in the law" by repeal of the former statute. 1A Sutherland, *supra,* § 23.24 at 403–04. *See, e.g., Sedlak v. Dick,* 256 Kan. 779, 887 P.2d 1119, 1136–37 (1995) (if legislature had not passed the invalid amendment, it would not have independently repealed the former law; thus, former statutes are "still in full force and effect as they existed prior to the attempted 1993 amendments"); *Topeka Cemetery Ass'n v. Schnellbacher,* 218 Kan. 39, 542 P.2d 278, 283 (1975) (because it was "highly unlikely" that legislature would have completely wiped out the tax exemption for graveyards without providing for a substitute, the repealing portion of the invalid amending statute would fall, thereby leaving the law as it existed prior to the attempted amendment "in full force and effect for the tax years involved in this case"); *S.W.M. v. State,* 647 So.2d 313, 314 (Fla.App.1994) (automatic revival of former escape statute where striking of new statutory language "will result in a 'hiatus in the law' that will be intolerable to society").

The Florida Supreme Court has done a recent extensive review of this issue:

> [O]ur research has disclosed not a single case anywhere in the United States holding that a statutory revival of the type at issue here [of a former criminal statute] violates due process or is invalid on any other basis. [citations omitted] The apparently unanimous view of the jurisdic-

---

**14.** In a footnote at this point, the author observes, "To cite the numerous cases on this point

would be superfluous."

tions addressing the problem is that a revival is proper and does not violate due process when the loss of the constitutionally invalid statutory language will result in an intolerable hiatus in the law.

*B.H. v. State,* 645 So.2d 987, 995 (Fla.1994). Again, "the fact that the legislature reenacted the section verbatim, adding only the proviso referred to," is a "strong indication" that it would not have repealed the former statute without providing a valid substitute. *City of Kansas City v. Robb,* 164 Kan. 577, 190 P.2d 398, 399 (1948).

 Public policy abhors a void in the law, particularly in areas of social legislation, such as those affecting the educational system:

> The common sense of this conclusion is evident and must be true. We must have valid legislation under which to administer our educational system. Therefore if an act is passed which is unconstitutional then the immediate preceding constitutional act must stand in its stead until some other valid enactment is enacted by the Legislature.

*McMinn County Board of Education v. Anderson,* 200 Tenn. 333, 292 S.W.2d 198, 201–02 (1956) (invalidating a statute requiring all teachers to contract with a school board for salaries; former statutory salaries reinstated).

 Public policy also compels courts not to eliminate constitutional funding by invalidation of an unconstitutional funding provision. *See City of Kansas City v. Robb,* 164 Kan. 577, 190 P.2d 398 (1948) (where invalid changes in law dealt primarily with funding of law enforcement training center, court could not conclude that legislature would have repealed former law without providing a valid substitute); *Missouri Ins. Co. v. Morris,* 255 S.W.2d 781 (1953) (where only difference between former tax statute and invalid amendment was addition of the clause found to be invalid, and where plaintiff did not challenge the efficacy of the section, with that provision deleted, to impose such a tax, the former act was revived by invalidation of the amended version).

The Arizona Supreme Court found this factor present in *Selective Life* by concluding that the legislature would not have repealed a section of the former statute, which provided for the appointment of a director of insurance under the supervision of the Corporation Commission, if it had known the amendment setting up a new insurance commissioner would be found to be unconstitutional; rather, the court found that, "in order to protect the purpose of the act in providing a means of regulation of foreign and domestic insurers," the repeal contained in the invalid amendment must also fall, and the former statute was held to be "in full force and effect." 101 Ariz. at 601, 422 P.2d at 717.

In this case, these factors clearly have been established by the nature of the legislation involved. The Arizona legislature, in 1989, enacted a statutory scheme to prescribe "an annual levy of tax ... in each school district not eligible for equalization assistance." *See* Senate Bill 1141, Ariz.Sess. Laws, ch. 312, § 3 (1st Reg.Sess.1989) (creating A.R.S. § 15–992(B)). In 1990, House Bill 2028 explicitly "amended" A.R.S. § 15–992(B) (1989) to create the unconstitutional classification invalidated in this opinion; however, it did not explicitly "repeal" the former version. Ariz.Sess.Laws, ch. 3, §§ 1, 4 (3d Sp.Sess.1990). However, under any rule of statutory construction, we can only conclude that the latter was a substitute for the former. Although legislative history on this amendment is virtually nonexistent, appellees have provided us with a "FY 1990–1991 Fiscal Reform Summary," prepared by Senate Staff and dated July 10, 1990, that describes the effect of the 1990 amendment as follows:

**Minimum School Tax Rate FY 1990–1991 GENERAL FUND IMPACT: $50.2 Million**

This component of the legislation replaced the FY 1989–1990 minimum school tax rate with a minimum tax rate applicable only to property in Classes 1 and 2 and property owned by Salt River Project (SRP). Generally, this element of the tax system requires that the school district tax rate levied on property located in school

districts which are not eligible to receive equalization assistance (state aid), be at least equal to a legislated minimum.

Previously, the minimum school tax rate applied to all property located in the school districts affected by the minimum, and was one-quarter of the qualifying tax rate (QTR). The QTR is $4.72 for a unified district and $2.36 for an elementary or a high school district. In FY 1989–1990, the one-quarter minimum impacted four school districts and generated approximately $25.4 million for the state general fund to aid in school financial assistance.

Under the new provision, the tax only applies to mine, utility, and SRP property and the minimum tax rate is 65 percent of the QTR. The legislation also provides that the minimum tax rate will increase to 75 percent of the QTR for FY 1991–1992 and to 85 per cent of the QTR beginning in FY 1992–1993.

Although in FY 1990–1991, it is estimated that the minimum school tax will generate $75.7 million, this gain is offset by the $25.4 million loss associated with the repeal of the one-quarter QTR minimum rate. *Consequently, the net gain to the state in FY 1990–1991 is projected to be $50.2 million. Similarly, in FY 1991–1992 and FY 1992–1993 the net gain to the state general fund is estimated to be $64.2 million and $78.3 million.*

Given this projection, we can hardly presume that, had the legislature known of the invalidity of the amending language, it would have chosen to "repeal" by implication the entire equalization assistance scheme contained in A.R.S. section 15–992(B) (1989) and forego those tax funds entirely. The intent of the amendment was to generate educational funds; we must assume that the legislature would have chosen to keep the QTR tax in force despite the invalidity of the amending language. Therefore, under the above authorities, the 1989 version of the statute meets the threshold requirements to be automatically reinstated in full force and effect as a result of the invalidity of the 1990 amendment.

The other criteria for application of this general rule of automatic revival are that the former version of the statute must be the immediate predecessor of the unconstitutional statute that was simultaneously repealed with enactment of the invalid statute, and the former statute must be constitutional. *See B.H. v. State,* 645 So.2d 987 (Fla.1994). Both factors are met in this case. The 1989 version of A.R.S. section 15–992(B) was the immediate predecessor to the unconstitutional 1990 amendment, and was implicitly repealed by its enactment, so revival is proper. Additionally, the former version is presumed constitutional until found to be invalid. The 1989 statute has not been challenged in this appeal by these taxpayers, who have explicitly conceded that it was constitutionally applied to them. Thus, we conclude that A.R.S. section 15–992(B) (1989) has been automatically revived by our holding that its 1990 amendment was unconstitutional as a special law. The practical effect of this revival in this case is that the taxpayers were subject to some valid amount of QTR tax during the periods in question; that they will not receive a "windfall" by refund of the amount that was constitutionally imposed; and that appellees may retain that portion of those taxes collected which was validly imposed. We discuss the application of this principle below.

### B. *Partial Refunds and Other Remedies*

In *McKesson,* the United States Supreme Court acknowledged the authority of state courts to fashion an assortment of remedies for a retroactively unconstitutional tax that was paid under protest. In *McKesson,* the Florida Supreme Court had denied refunds of an excise tax on alcoholic beverages that discriminated in favor of local products and violated the commerce clause. Instead, the Florida court enjoined future enforcement of the invalid tax, and suggested that a refund would result in a "windfall" to McKesson, who had passed the cost onto its customers. The United States Supreme Court reversed, holding that because the tax was paid under duress, the due process clause required retroactive relief; the Court reasoned that prospective relief would not deter the state from enacting unlawful taxes and col-

lecting them under duress if no retroactive refund were required. 496 U.S. at 33, 110 S.Ct. at 2248. However, the Court did not require that a total refund be ordered, but allowed the state to fashion any remedy that would cure the defect. A total refund was merely one of the alternatives; another potential remedy was a partial refund, based on the following reasoning:

> Had the Florida courts declared the Liquor Tax invalid either because ... it was beyond the State's power to impose, ... or because the taxpayers were absolutely immune from the tax, ... [t]he State would have had no choice but to "undo" the unlawful deprivation by refunding the tax previously paid under duress, because allowing the State to "collect these unlawful taxes by coercive means and not incur any obligation to pay them back ... would be in contravention of the Fourteenth Amendment.".... *Here, however, the Florida courts did not invalidate the Liquor Tax in its entirety; rather, they declared the tax scheme unconstitutional only insofar as it operated in a manner that discriminated* against interstate commerce. The State may, of course, choose to erase the property deprivation itself by providing petitioner with a full refund of its tax payments. But ... *a State found to have imposed an impermissibly discriminatory tax retains flexibility in responding to this determination.* Florida may reformulate and enforce the Liquor Tax during the contested tax period in any way that treats petitioner and its competitors in a manner consistent with the dictates of the Commerce Clause. Having done so, *the State may retain the tax appropriately levied upon petitioner pursuant to this reformulated scheme because this retention would deprive petitioner of its property pursuant to a tax scheme that is valid under the Commerce Clause.*

*McKesson,* 496 U.S. at 39–40, 110 S.Ct. at 2251–52 (emphasis added). After reaching this conclusion, the Court suggested three acceptable remedial alternatives that would provide due process. First, the state may "refund to petitioner the difference between the tax it paid and the tax it would have been assessed were it extended the same rate reductions that its competitors actually received." *Id.* at 40, 110 S.Ct. at 2252. Second, the state could "assess and collect back taxes from petitioner's competitors who benefitted from the rate reductions during the contested tax period, calibrating the retroactive assessment to create in hindsight a nondiscriminatory scheme." [15] *Id.* Third, the state could fashion "a combination of a partial refund to petitioner and a partial retroactive assessment of tax increases on favored competitors." *Id.* at 41, 110 S.Ct. at 2252. The Court also suggested several options available to the state to reduce the potential for such large refund claims in the future, including adopting installment refunds, subjecting claims under protest to short statutes of limitations, and placing protested funds in an escrow account pending the outcome of constitutional disputes. *Id.* at 45, 110 S.Ct. at 2254–55.

*McKesson* involved a commerce clause violation, while the present case before us involves an unconstitutional special law. To some extent the nature of the constitutional injury involved in each case may differ in respects that would affect the nature of the remedy. For example, the *McKesson* Court pointed out that the "injury" in that case included the economic competitive disadvan-

---

**15.** Although the *McKesson* Court stated that "retroactive assessment of a tax increase does not necessarily deny due process to those whose taxes are increased," the court also stated it "need not decide whether this choice would violate due process by unduly interfering with settled expectations." 496 U.S. at 40 n. 23, 110 S.Ct. at 2252 n. 23.

As the taxpayers point out in their supplemental brief, the alternative remedy of assessing retroactive property taxes on the other classes of property "would be harsh and oppressive, triggering significant due process concerns," and would constitute "an onerous tax burden for virtually any property owner." Additionally, because the tax in this case involves potential liens on property, we believe the "settled expectations" due process concerns expressed in *McKesson* would come into play. *See In re Westward Look Dev. Corp. v. Department of Revenue,* 138 Ariz. 88, 90, 673 P.2d 26, 28 (App.1983).

For that reason, and because appellants did not request this relief for the constitutional violation, we do not consider this alternative as part of the remedy in this case.

tage suffered by the non-favored class as a result of discrimination in favor of its competitors, who constituted the favored class. 496 U.S. at 48, 110 S.Ct. at 2256; *see also id.* at 42 and n. 25, 110 S.Ct. at 2253 and n. 25. Thus, it was necessary to impose the same burden on the competitors in order to restore the non-favored class to its prior position. In this case, however, the utilities are not economically competitive with the favored class—non-utility and non-mining properties—which includes homeowners. Arguably, therefore, the "injury" suffered from this special law is *not* that the taxpayers paid QTR taxes while the favored class did not, but that, *because* the favored class did not, they paid more than their valid share. In that event, they may be made whole by a refund of the difference between what they actually paid under the unconstitutional law and what they should have paid under the prior, constitutional law.

In this case, however, we need not examine the economic distinctions between different types of constitutional injuries. The nature of the relief requested by the taxpayers was clearly stated in their complaints filed in the tax court, as follows:

> WHEREFORE, Plaintiffs pray that this Court enter judgment against Defendants as follows:
>
> A. Declaring A.R.S. § 15–992(B) ... unconstitutional and ... (3) directing the State Treasurer to refund to Plaintiffs taxes paid pursuant to A.R.S. § 15–992(B);
>
> ....
>
> E. Awarding Plaintiffs judgment in a sum equal to the property taxes paid by Plaintiff to the Defendant Counties for the 1990 and 1991 tax years *in excess of the amount that could have been lawfully fixed, levied, assessed and collected by each County* and ordering a refund of such excess tax pursuant to A.R.S. § 42–204(C);
>
> F. Alternatively, declaring that any monies levied *in excess of the lawful limi-*

*tation* be maintained in a separate fund and be used to reduce the tax levy of each County in subsequent years pursuant to A.R.S. § 42–301(I).

(Emphasis added.) The taxpayers did not request either a full refund of all QTR taxes paid nor, alternatively, that the favored class be retroactively taxed to the same extent that they were for these tax years. Thus, to the extent that the taxpayers arguably might have been constitutionally entitled to more under *McKesson,* we hold that they waived their claim to anything other than that requested when they filed this action.[16] *See Arnold v. Cesare,* 137 Ariz. 48, 52, 668 P.2d 891, 895 (App.1983) (remedy not requested in trial court is waived on appeal). Thus, on remand, the tax court need not consider the alternatives of either a full refund of all QTR taxes paid in 1990 and 1991, or a retroactive taxing of the favored class for 1990 and 1991 under operation of A.R.S. section 15–992(B) (1989).

We find the remedy of a partial refund to be appropriate as well because of the nature of the taxpayers' challenge. They have not challenged as void the entire QTR tax, but only that part of it that disfavors them. By eliminating that portion and leaving the balance intact, we can afford the taxpayers their requested relief. Thus, they are entitled to receive as a refund only that amount they paid that is greater than what they would have had to pay had the special law not been in effect.[17] As a result, the taxpayers will have paid their proportionate valid share of QTR tax under the revived constitutional predecessor statute.

### C. *Computation of a Partial Refund*

In computing the amount of the partial refund to remedy the violation, we believe the tax court should follow these forthright principles. First, we assume that the total amount of QTR taxes actually collected in 1990 and 1991 by the counties from class one and class two properties under operation of

---

16. We find untenable the taxpayers' claim in their supplemental brief that, despite the relief requested in their complaint, they are entitled to a full refund of *"all* taxes paid pursuant to A.R.S. section 15–992(B) (1990)," in the amount of $67,798,023 for 1990 and $76,172,612 for 1991.

17. We rejected above appellees' argument that appellants would have paid more taxes in 1990 and 1991 under the former 1989 statute than they paid under the special law.

A.R.S. section 15–992(B) (1990) is the amount of revenue that was required for those tax years. Obviously, had the 1989 statute been in effect, non-utility and non-mining properties would have paid their proportionate share of that total amount collected, and the taxpayers would have paid less. The proportion they would have paid can be computed as a percentage of their assessed valuation to total assessed valuation in each affected district. The difference between what the taxpayers actually paid for those tax years and what they would have paid had all properties been taxed is the measure of the refund to which they are entitled.[18] In addition, the tax court has discretion in fashioning a repayment or a crediting procedure, or a combination thereof, keeping in mind the relief requested by the taxpayers in their complaints, and the operation of the statutes relating to such refunds. *See, e.g.,* A.R.S. §§ 42–204(C), –301(I), 42–178(F).[19] We encourage the parties to cooperate in finding a solution that will not disrupt the purposes of the QTR tax scheme or hamper the availability of educational funds, and we leave to the tax court the discretion to compute the amount of the refund and to fashion the remedy that will be entered as a judgment in this case. *See, e.g., Scholten v. Blackhawk Partners,* 184 Ariz. 326, 331, 909 P.2d 393, 398 (App.1995), ("Not only is the trial court in a better position than this court to weigh the equities and fashion the appropriate equitable relief, but it can also require the parties

to develop a factual record on which to base its decision").

As a final matter, we address appellees' supplemental argument that a partial refund as a remedy in this case would be inconsistent with this court's recent opinion in *Scottsdale Princess Partnership v. Maricopa County,* 197 Ariz.Adv.Rep. 57, 185 Ariz. 368, 916 P.2d 1084 (App. Aug. 24, 1995). We find no inconsistency. In *Scottsdale Princess,* we found that the taxpayer "was not entitled to a full refund without regard to the actual harm it sustained." *Id.* at 59, at 372, 916 P.2d at 1088. Under the proper tax assessment, the taxpayer's burden would have been unchanged. *Id.* at 60, at 374, 916 P.2d at 1090. In this case, however, the taxpayers' proportionate tax burden would have been decreased had all property classes been taxed. Thus, a partial refund is appropriate.

### Attorneys' Fees on Appeal

The taxpayers request awards of attorneys' fees on appeal pursuant to A.R.S. section 12–348(B). El Paso additionally requests attorneys' fees pursuant to A.R.S. sections 12–341.01(C) and 12–349. We grant awards of attorneys' fees to all appellants pursuant to A.R.S. section 12–348(B) only, upon their compliance with Rule 21(c), Arizona Rules of Civil Appellate Procedure.

### CONCLUSION

We hold A.R.S. section 15–992(B) (1990) unconstitutional as a special law in violation

---

18. For example, using as a hypothetical example appellees' own assertion, that mining and utility properties in the affected districts comprised an average of 97.6% of the total assessed value of those districts, would lead to the conclusion, by our computation methods, that the taxpayers would be entitled to an average 2.4% refund of the QTR taxes they actually paid. This would be the difference between what they would have paid had 100% of the property in that district been subject to the QTR tax, and what they actually paid, which was 100% of the tax collected. Further using appellees' hypothetical amount of $100 million in QTR tax collected in an average tax year, the taxpayers would be entitled to an average partial refund of $2.4 million for that average tax year under our computation. This is not purported to be an exact figure. As we point out later in this decision, the tax court is to compute the exact amount of the refund and fashion the remedy.

19. We note that the statutory scheme provides a procedure for satisfying judgments entered in favor of taxpayers that protects the integrity of the state's general fund:

> [T]he judgment shall be paid by the county treasurer of the county in which the property is located out of sums collected from property taxes during the next fiscal year, unless there are sufficient sums available in funds budgeted for that purpose by the county to allow an immediate refund, or, if both parties agree, the amount of the judgment may be credited toward any taxes which may be remaining due on the property which is the subject of the appeal, subject in either case to the approval of the board of supervisors.

A.R.S. § 42–178(F). This is the statutory mechanism for repayment of illegally collected taxes. *See Peabody Coal Co. v. Navajo County,* 117 Ariz. 335, 572 P.2d 797 (1977).

of Ariz. Const. Art. 4, Part 2, § 19(9). We hold that the amendments to A.R.S. section 42–227(A)(1) and (2) were constitutionally applied retroactively to January 1, 1990. Additionally, we conclude that the tax court's dismissal of El Paso Electric Company's complaint for failure to pay accruing taxes during bankruptcy proceedings is void pursuant to 11 U.S.C. section 362(a)(1), and direct that El Paso's claim be reinstated on remand, subject to any subsequent developments.

Our holding that A.R.S. section 15–992(B) (1990) is unconstitutional applies retroactively, with the result that its immediate predecessor, A.R.S. section 15–992(B) (1989), is automatically revived. The taxpayers are entitled to a partial refund of the QTR taxes they paid in 1990 and 1991 under the invalid law, computed as the difference between what they actually paid and what they would have paid had the favored class been included in contribution to the total amount of funds received by the counties in each of those tax years under the prior law. Appellants are awarded their attorneys' fees on appeal.

Affirmed in part; reversed in part and remanded for proceedings consistent with this opinion. The opinion of the tax court, 175 Ariz. 485, 857 P.2d 1339, is vacated.

KLEINSCHMIDT and SULT, JJ., concur.