PER CURIAM.
We have for review the decision in B.H. v. State, 622 So.2d 615 (Fla. 5th DCA 1993), which expressly and directly conflicts with the opinion in D.P. v. State, 597 So.2d 952 (Fla. 1st DCA 1992). We have jurisdiction. Art. V, § 3(b)(3), Fla. Const.
Petitioner B.H., a child, was charged with escape from a juvenile commitment facility in violation of section 39.061, Florida Statutes (Supp.1990).[1] B.H. pled nolo con-tendere, reserving the right to appeal the constitutionality of the statute. Subsequently, B.H. was adjudicated delinquent and committed to the Department of Health and Rehabilitative Services. On appeal to the Fifth District, B.H.’s adjudication of delinquency was affirmed. B.H.
Section 39.061, Florida Statutes (Supp. 1990), provides in pertinent part:
An escape from any secure detention facility or any residential commitment facility of restrictiveness level VI or above ... constitutes escape within the intent and meaning of s. 944.40 and is a felony of the third degree.
The statute further states:
“Restrictiveness level” means the identification of broad custody categories for committed children, including nonresidential, residential, and secure residential. Specific placement in restrictiveness levels within these categories depends upon the risk and needs of the individual child. Restrictiveness levels must be established by [HRS] *990 by rule, provided however that there shall be no more than eight levels.
§ 39.01(61), Fla.Stat. (Supp.1990). In D.P., the First District concluded that these provisions improperly delegate legislative authority to HRS, in effect, to determine what the crime of juvenile escape actually is. The D.P. court reasoned that, under the statute as it then existed, HRS and not the legislature defined each of the various restrictiveness levels. We accepted jurisdiction to resolve the conflict.
I. Nondelegation
The present case squarely presents an issue that has vexed courts and legal scholars for some time now: How much of a role may administrative agencies take in defining the elements of a crime? We note that the federal courts frequently have addressed this question, but with strikingly inconsistent results.
In 1897, the United States Supreme Court for the first time approved of an agency taking an extremely limited role in defining a crime consisting of selling oleomargarine in containers not properly marked in a manner designated by the Commissioner of Internal Revenue. The Court approved the statute on grounds that the Commissioner’s involvement — designating an official mark — was negligible and therefore Congress had not improperly delegated its lawmaking authority to the executive branch. Edmund H. Schwenk, The Administrative Crime, Its Creation and Punishment by Administrative Agencies, 42 Mich.L.Rev. 51, 56-57 (1943) (citing In re Kollack, 165 U.S. 526, 17 S.Ct. 444, 41 L.Ed. 813 (1897)).
In 1910, the United States Supreme Court went a step further and approved a statute criminalizing the act of grazing sheep on certain public lands without obtaining permission in a manner prescribed by the Secretary of Agriculture. The Court again upheld the statute on grounds that no lawmaking authority had been delegated to the executive agency. United States v. Grimaud, 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563 (1911); accord Light v. United States, 220 U.S. 523, 31 S.Ct. 485, 55 L.Ed. 570 (1911).
The limits of the Court’s evolving doctrine were drawn, at least temporarily, in two cases that are much studied in law schools and that students often call the “Hot Oil” and “Sick Chicken” cases. Harlan S. Abrahams, et al., Separation of Powers & Administrative Crimes: A Study of Irreconcilables, 1976 So.Ill.L.J. 1, 47-49 (citing Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935); A.L.A. Schecter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935)). In these cases, the United States Supreme Court invalidated statutes that had delegated authority to the President to issue administrative rules on oil and poultry production that defined elements of certain crimes. Id. & id. at 47 n. 172. The historical context of these opinions is important in understanding what ultimately became of them.
The two cases arose at a time when the administration of President Franklin D. Roosevelt was grappling with the enormous problems of the Great Depression, which was widely viewed as a serious threat to American democracy. Congress’s response was the wholesale creation of what we now consider to be modern federal administrative law. Mark D. Alexander, Increased Judicial Scrutiny for the Administrative Crime, 77 Cornell L.Rev. 612, 621 (1992). The Supreme Court, however, began striking a number of these statutes in a variety of cases, among them being Panama Refining and Schecter Poultry, both decided in 1935. President Roosevelt responded with his famous threat to greatly expand the number of Supreme Court associate justices so that he then could “pack the Court” and gain judicial acceptance of his New Deal reforms.
Although Congress failed to expand the Court as Roosevelt wanted, the threat nonetheless succeeded in a manner: The Court suddenly began approving New Deal legislation either expressly or by refusing to hear cases upholding the new laws. By the outbreak of the Second World War, the Court typically refused to interfere with administrative schemes created by Congress and enforced by executive agencies, even when they involved administrative involvement far more sweeping than those struck in 1935. *991 Nevertheless, Panama Refining and Schec-ter Poultry have never been overruled; and the Court occasionally has hinted that they may not entirely be dead letters. Abrahams, supra, at 49 (citing Kent v. Dulles, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958)).
The federal courts’ stance in this regard has been sternly criticized. The most comprehensive study of the subject, Abrahams, supra, has argued that the far-ranging administrative powers tolerated in the federal system are contrary to the fundamental philosophy underlying American democracy. Abrahams notes that the European political philosophers widely viewed as forebears of the federal Constitution strongly decried the accumulation of powers in a single person or organ of government.
John Locke’s Second Treatise, for example, contends there can be no justice or liberty if legislative and executive powers are unified. Abrahams, supra, at 19 & 19 n. 60 (citing P. Laslett, John Locke’s Two Treatises of Government: A Critical Edition with an Introduction &. an Apparatus Criticus (1960)). Likewise, Montesquieu’s Spirit of the Laws argues that genuine liberty is dependent on the rule of law, which in turn is dependent on a true separation of powers enforced by a system of checks and balances. Id. (citing Montesquieu, Spirit of the Laws (Newmann ed. 1949)).
At the very least, the present-day federal conception of administrative involvement in defining crimes remains rife with unresolved tensions. If the United States Supreme Court tolerates powers of wide-ranging character, that toleration clearly emerged out of two major national crises — the Great Depression and the Second World War — that do not necessarily dictate the same result at the state level. Moreover, the failure to overrule Panama Refining and Schecter Poultry suggests that the remaining questions of federal law may someday be reopened. At least two justices sitting on the present Court have indicated exactly that. See Mistretta v. United States, 488 U.S. 361, 413, 109 S.Ct. 647, 676, 102 L.Ed.2d 714 (1989) (Scalia, J., dissenting); American. Textile Mfrs. Inst., Inc., v. Donovan, 452 U.S. 490, 543,101 S.Ct. 2478, 2507-08, 69 L.Ed.2d 185 (1981) (Rehnquist, J., dissenting); Industrial Union Dep’t, AFL-CIO, v. American Petroleum Inst., 448 U.S. 607, 671, 100 S.Ct. 2844, 2878-79, 65 L.Ed.2d 1010 (1980) (Rehnquist, J., concurring in the judgment).
We now turn to Florida law on the same question. Any discussion must begin by noting several special features of the state Constitution, which we are required to honor under the doctrine of primacy notwithstanding less stringent federal law. Traylor v. State, 596 So.2d 957 (Fla.1992). In Florida, the state is entirely a creation of the people, in whom all political powers still inhere— including the ability to create or modify a state Constitution.[2] Compare art. I, § 1, Fla. Const, with art. XI, Fla. Const. Pursuant to their inherent powers, the people of Florida have established a tripartite separation of powers precisely like that envisioned by Locke and Montesquieu:
The powers of the state government shall be divided into legislative, executive and judicial branches. No person belonging to one branch shall exercise any powers appertaining to either of the other branches unless expressly provided herein.
Art. II, § 3, Fla. Const, (emphasis added).
The prohibition contained in.the second sentence of Article II, section 3 of the Florida Constitution could not be plainer, as our cases clearly have held. This Court has stated repeatedly and without exception that Florida’s Constitution absolutely requires a “strict” separation of powers. Cases on this point are numerous, but an examination of a leading decision will suffice. In Askew v. Cross Key Waterways, 372 So.2d 913, 924 (Fla.1978), we stated:
Article II, Section 3, Florida Constitution, contrary to the Constitution[ ] of the United States ... does by its second sentence *992 contain an express limitation upon the exercise by a member of one branch of any powers appertaining to either of the other branches of government.
[[Image here]]
[The nondelegation doctrine] represents a recognition of the express limitation contained in the second sentence of Article II, Section 3 of our Constitution. Under the fundamental document adopted and several times ratified by the citizens of this State, the legislature is not free to redele-gate to an administrative body so much of its lawmaking power as it may deem expedient.
Accord Brown v. Apalachee Regional Planning Council, 560 So.2d 782 (Fla.1990); Department of Ins. v. Southeast Volusia Hosp. Dist., 438 So.2d 815 (Fla.1983), appeal dismissed 466 U.S. 901, 104 S.Ct. 1673, 80 L.Ed.2d 149 (1984); Conner v. Joe Hatton, Inc., 216 So.2d 209 (Fla.1968). In sum, Florida has expressly and repeatedly rejected whatever federal doctrine can be said to exist regarding nondelegation.[3]
Moreover, unlike the apparent federal approach, Florida has not relied on implied powers, arguments of expedience or necessity, or any penumbral theory in gauging the contours of the separation of powers. In Chiles v. Children A -⅞ C, D, E, & F, 589 So.2d 260, 264 (Fla.1991), for example, we used a purely textual analysis of the Constitution to determine the exact dimensions of the powers given to different branches of government. What the Constitution’s plain language says on this subject is what the courts of Florida enforce. If a statute purports to give one branch powers textually assigned to another by the Constitution, then that statute is unconstitutional. Id. We thus must examine what the Constitution says about the powers at issue in this proceeding today.
Article III of the Constitution states that “[t]he legislative power of the state shall be vested in a legislature of the State of Florida.” Art. Ill, § 1, Fla. Const. This grant of power embraces both “the power to enact laws” and the power “to declare what the law shall be.” Chiles, 589 So.2d at 264. Any attempted redelegation violates the Constitution. Id.
The term “legislative power” as used in Article III most particularly embraces statutes defining criminal offenses; and in the field of criminal law, the concept of separation of powers is directly linked to the Constitutional guarantee of due process. Thus, we have held that “criminal statutes must be strictly construed according to their letter, and ... this rule emanates from article I, section 9 and article II, section 3 of the Florida Constitution.” Jeffries v. State, 610 So.2d 440, 441 (Fla.1992). The nondelegation doctrine arising from article II, section 3 is directly at issue because “the power to create crimes and punishments in derogation of the common law inheres solely in the democratic processes of the legislative branch.” Perkins v. State, 576 So.2d 1310, 1312 (Fla.1991) (emphasis added). Likewise, due process is implicated because article I, section 9 requires that a criminal statute reasonably apprise persons of those acts that are prohibited; and the failure to do so constitutes a due process violation. Jeffries; Perkins.
These conclusions apply all the more forcefully to felonies, like the one at issue here. The Constitution itself states:
The term “felony” as used herein and in the laws of this state shall mean any criminal offense that is punishable under the laws of this state, or that would be punishable if committed in this state, by death or by imprisonment in the state penitentiary.
Art. X, § 10, Fla. Const, (emphasis added). In sum, no felony can exist under Florida law unless created by a valid statute properly approved by the legislature. Thus, Florida recognizes no common law felonies. Accord § 775.02, Fla.Stat. (1989) (no common law crime may be treated as- a felony). The Constitution further provides:
No administrative agency shall impose a sentence of imprisonment, nor shall it impose any other penalty except as provided by law.
*993 Art. I, § 18, Fla. Const. While this provision speaks only to the quasi-adjudicatory powers of some administrative agencies, it nevertheless embodies an overall constitutional policy that administrative agencies may not create a criminal statute or its equivalent and prescribe the penalty.
At times, a very fine line may separate an improper usurpation of legislative authority from valid agency rulemaking. As a general rule, our cases have noted that the legislature’s exclusive power encompasses questions of fundamental policy and the articulation of reasonably definite standards to be used in implementing those policies. Askew. This, too, is a question much like the due process concern over the vagueness of a statute. Thus, in Conner, 216 So.2d at 211, we noted:
When the statute is couched in vague and uncertain terms or is so broad in scope that no one can say with certainty, from the terms of the law itself, what would be deemed an infringement of the law, it must be held unconstitutional as attempting to grant to the administrative body the power to say what the law shall be.
It is true that
[flexibility by an administrative agency to administer a legislatively articulated policy is essential to meet the complexities of our modern society[.]
Askew, 372 So.2d at 924. Nevertheless, we stated those words in the context of reviewing land-use regulations. In the criminal law context, there also may be some degree of flexibility consistent with the nondelegation doctrine, but only to the extent that the statute itself provides adequate notice of the prohibited conduct. Any other rule would violate due process, rendering the statute invalid on that independent basis. Art. I, § 9, Fla. Const.; Jeffries; Perkins.
This Court appears never to have addressed the precise question of how extensive a role administrative agencies may take in defining the elements of crimes.[4] Nevertheless, at least one of our cases has dealt with an analogous issue. In Conner, 216 So.2d at 211-12, we confronted in pertinent part a statutory provision purporting to give the Florida Commissioner of Agriculture authority to prohibit “unfair trade practices” in certain agricultural markets.
The case itself did not involve any attempt to enforce a criminal penalty, but we did strike the “unfair trade practices” provision as a violation of separation of powers. Accord Robbins v. Webb’s Cut Rate Drug Co., 153 Fla. 822, 16 So.2d 121 (1943). Obviously, the “unfair trade practices” language arguably delegated some penal authority to the Commissioner in violation of both article I, section 9 and article II, section 3.
It clearly is impossible to adopt a single bright-line test to apply to all alleged violations of the nondelegation doctrine. The delegation of authority to define a crime, for example, is of such a different magnitude from noncriminal cases that more stringent rules and greater scrutiny certainly is required. This conclusion is consistent with the decisional law. Our earlier cases indicate that, in some instances, the subject matter of the statute may be such that greater discretion must be delegated. Conner, 216 So.2d at 212. Certainly, modern society requires that administrative agencies receive some flexibility in how they may use their authority, Askew, 372 So.2d at 924, and this may be true to a lesser extent even in the criminal law context.
Nevertheless, one clear principle emerges from the case law outlined above: The legislature may not delegate open-ended authority such that “no one can say with certainty, from the terms of the law itself, what would be deemed an infringement of the law.” Conner, 216 So.2d at 211 (emphasis added). In the present context, such an attempted delegation necessarily creates the simultaneous violation of article I, section 9 and article II, section 3' of the Florida Constitution. In other words, there is a due process violation for the statute’s failure on its face to give adequate notice of the prohibited act; and there is a violation of the separation of powers in the attempt to give an administrative agency power to define a crime.
*994 Both of those principles have been violated here. The statute we review today merely declares that the crime consists of “escape from any secure detention facility or any residential commitment facility of restrictiveness level VI or above.” § 39.061, Fla.Stat. (Supp.1990). HRS, meanwhile, is given purported authority to define the “restrictiveness levels” in terms of broad custody categories based on “the risk and needs of the individual child,” of which there can be no more than eight. § 39.01(61), Fla.Stat. (Supp.1990). Beyond this, no meaningful limitations are placed on HRS’s purported authority.
While these restrictions may create a minimum standard, they completely fail to create a maximum point beyond which HRS cannot go. At the very least, all challenged delegations in the criminal context must expressly or tacitly rest on a legislatively determined fundamental policy; and the delegations also must expressly articulate reasonably definite standards of implementation that do not merely grant open-ended authority, but that impose an actual limit — both minimum and maximum — on what the agency may do. Art. II, § 3, Fla. Const. The statute here fails because it made an open-ended delegation of the kind condemned in Conner.
The unlimited and arbitrary nature of the delegation here is only underscored by one feature of HRS’s implementing regulation: HRS chose to create only four restrictiveness levels, yet in an apparent effort to invoke the statutory penalties, HRS numbered the levels using only even numbers. The four levels are 2 (nonresidential), 4 (low-risk residential), 6 (moderate-risk residential), and 8 (high-risk residential). Fla. Admin. Code R. 10M-32.001(3). Had HRS numbered the levels in the usual sequence of 1 through 4, the crime of juvenile escape could never have been possible with regard to commitment facilities because none would have been “of restrictiveness level VI or above.” § 39.061, Fla. Stat. (Supp.1990).
Yet, the fact that HRS skipped odd numbers indicates that the agency felt it could have adopted virtually any numbering system it chose. For example, HRS might have designated the four levels respectively as 10, 20, 30, and 40. In that case, the crime of juvenile escape would have applied even to the least restrictive levels because all would have been “of restrictiveness level VI or above,” which is all that the statute requires. § 39.061, Fla.Stat. (Supp.1990). In sum, HRS was improperly delegated and improperly assumed authority to declare what constituted the crime of juvenile escape, without limit.
There also is a clear violation of the related due process rights outlined in Jeffries and Perkins. In simple terms, the language of the statute itself wholly fails to give notice of the prohibited act. The fact that an agency rule may attempt to fill the gap is not a relevant concern in this context, especially in light of the fact that the agency had no constitutionally valid authority to adopt the relevant rule. See Conner, 216 So.2d at 211. The failure to give proper notice of the conduct that is prohibited renders this statute independently invalid under article I, section '9 of the state Constitution.
The court below also suggested a belief that judicial involvement in determining restrictiveness levels may help cure any constitutional problem. B.H., 622 So.2d at 617 (citing § 39.052(3)(e)3, Fla.Stat. (Supp.1990)). We respectfully disagree. The improper delegation here was from the legislature to an executive agency. It thus is irrelevant that the third branch of government happens to be involved at some point in administering the statute and rules. A judicial determination of restrictiveness level does not in any sense resolve the central problem here: the fact that an executive agency in effect has been delegated authority to define a felony, without limit.
Accordingly, we hold that section 39.061, Florida Statutes (Supp.1990), is unconstitutional for violating both the nondele-gation and vagueness doctrines. We further find that the defective portion of section 39.061 is not reasonably severable from the remainder: If the defective portion were severed, it would be a felony for a juvenile to escape from pretrial “secure detention” but not to escape from a post-trial commitment *995 facility. That would be an absurdity, because it would harshly punish pretrial escape but provide no punishment whatsoever for escape after adjudication. Accordingly, the entire statute fails.
II. Statutory Revival
The district court below concluded in the alternative, as the State now argues, that the invalidity of the juvenile escape statute must work an automatic revival of the earlier escape statute. As authority, the district court cited Messer v. Jackson, 126 Fla. 678,171 So. 660 (1936). The Fifth District reasoned that invalidity of section 39.061 necessarily meant that any associated repealer provisions also are inoperative. We agree with the district court’s conclusion, though not its entire analysis.
The issue in Messer was a statute that had failed to meet the constitutional procedures imposed upon the legislative process. In other words, the statute was illegally enacted and thus was void ab initio, as opposed to being merely voidable. All parts of an act void because of defective enactment never have any actual effect, including repealers. See, e.g., Messer, 171 So. at 662; Amos v. Mosley, 74 Fla. 565, 77 So. 619 (1917). The present case, on the other hand, involves a portion of an enactment that is merely voidable for violation of the nondelegation and vagueness doctrines. There is no allegation here of a defect in adoption, which distinguishes the present ease from Messer.
Nevertheless, we find the result reached by the district court to be supportable based on well established principles of statutory revival. Florida law has long held that, when the legislature approves unconstitutional statutory language and simultaneously repeals its predecessor, then the judicial act of striking the new statutory language automatically revives the predecessor unless it, too, would be unconstitutional.[5] State ex rel. Boyd v. Green, 355 So.2d 789 (Fla.1978); Henderson v. Antonacci, 62 So.2d 5 (Fla.1952); Brister v. State, 622 So.2d 552 (Fla. 3d DCA 1993); Rankin v. State, 620 So.2d 1028 (Fla. 2d DCA 1993); Miffin v. State, 615 So.2d 745 (Fla. 2d DCA 1993). As courts in other states have noted, this rule generally is applicable only where the loss of the invalid statutory language will result in a “hiatus” in the law that would be intolerable to society. State in re Hunter, 387 So .2d 1086, 1090 (La.1980).
Perhaps the clearest application of these principles in Florida occurred in Waldrup v. Dugger, 562 So.2d 687 (Fla.1990). There, the Court confronted a situation in which the legislature approved a law reducing certain gain-time awards to inmates, which clearly violated the federal guarantee against ex post facto laws. The statutory language thus was voidable on that basis. Nevertheless, the Waldrup Court recognized that the loss of that language would have resulted in a hiatus in the law: If the entire statute failed, then the ex post facto violation would have been even graver because inmates would have been entitled to no gain time at all. Accordingly, the Court revived the predecessor language and thereby eliminated the ex post facto problem. Id. at 693-94. Accord Boyd, 355 So.2d at 795; Henderson, 62 So.2d at 7.
We are mindful of the due process concerns raised by Justice Kogan’s partial dissent. Nevertheless, our research has disclosed not a single case anywhere in the United States holding that a statutory revival of the type at issue here violates due process or is invalid on any other basis. The apparently unanimous view of the jurisdictions addressing the problem is that a revival is proper and does not violate due process when the loss of constitutionally invalid statutory language will result in an intolerable hiatus in the law. E.g., Ross v. Goshi, 351 F.Supp. 949 (D. Hawaii 1972); Kwik Shop, Inc. v. City of Lincoln, 498 N.W.2d 102 (Neb.1993); Communications Workers of America v. Florio, 130 N.J. 439, 617 A.2d 223 (1992); Concerned Business & Property Owners v. De- *996 Soto Parish School Bd., 531 So.2d 436 (La. 1988); Westinghouse Credit Corp. v. J. Reiter Sales, Inc., 443 N.W.2d 837 (Minn.Ct.App. 1989).
Numerous states explicitly have applied the same principle of law to revive the language of criminal statutes purportedly superseded by an unconstitutional enactment. E.g., State v. Bloss, 64 Haw. 148, 637 P.2d 1117 (1981), cert. denied, 459 U.S. 824, 103 S.Ct. 56, 74 L.Ed.2d 60 (1982); State v. Clayton, 233 La. 972, 99 So.2d 312 (1957); State v. Clark, 367 N.W.2d 168 (N.D.1985); State v. Driver, 598 S.W.2d 774 (Tenn.1980); see Clark v. State, 287 A.2d 660 (Del.), cert. denied, 409 U.S. 812, 93 S.Ct. 139, 34 L.Ed.2d 67 (1972). Other states likewise have applied the same principle in the context of matters directly related to the enforcement of criminal laws, including procedural concerns and forfeiture proceedings. E.g., People v. Gersch, 135 Ill.2d 384, 142 Ill.Dec. 767, 553 N.E.2d 281 (1990); Shults v. State, 696 S.W.2d 126 (Tex.Ct.App.1985).
The United States Supreme Court has never disapproved any of the decisions cited here with respect to the revival issue, even where a due process argument was addressed and rejected in the state court’s opinion. Clark, 287 A.2d at 664. Moreover, analogous decisions from the Supreme Court support the general revival principle enunciated here. E.g., Frost v. Corporation Comm’n, 278 U.S. 515, 49 S.Ct. 235, 73 L.Ed. 483 (1929); Patapsco Guano Co. v. Board of Agriculture, 171 U.S. 345, 18 S.Ct. 862, 43 L.Ed. 191 (1898); Norton v. Shelby County, 118 U.S. 425, 6 S.Ct. 1121, 30 L.Ed. 178 (1886).
Given the overwhelming weight of authority throughout the United States, we see no reason to adopt the views advanced by the partial dissents. We find that this conclusion fully comports with due process, U.S. Const., amend. XIV, and we hold that the failure of section 39.061, Florida Statutes (Supp.1990), worked an automatic revival of its immediate predecessor, section 39.112, Florida Statutes (1989).
This is so because we find the last statute free of the constitutional defect unwittingly created by the 1990 amendment. Section 39.112 provides:
An escape from any halfway house, training school, boot camp, or secure detention facility maintained for the treatment, rehabilitation, or detention of children who are alleged or found to have committed delinquent acts or violations of law constitutes escape within the intent and meaning of s. 944.40 and is a felony of the third degree.
Id. There obviously is no delegation of authority whatsoever to HRS, which eliminates any possibility of a nondelegation violation. Moreover, the crime is fully and clearly defined in the statute itself, eliminating the vagueness problem.
We now proceed to determine whether B.H.’s adjudication can be sustained on the basis of section 39.112. Initially, we agree with the district court below that an erroneous reference to a statute in a charging instrument is not fatal to the conviction if the necessary elements of the offense otherwise are properly alleged. B.H., 622 So.2d at 618 (citing Sanders v. State, 386 So.2d 256 (Fla. 5th DCA 1980)). The petition charging B.H. with the offense of juvenile escape read as follows:
SPECIFICATIONS OF CHARGE: In that [B.H.], on or about the 5th day of March, 1992, at or near Daytona Beach within Volusia County, Florida, did, while a prisoner confined in Volusia House, then and there escape or attempt to escape from such lawful confinement.
Because these specifications clearly allege all elements necessary under section 39.112, we hold that B.H.’s adjudication will be sustained on the basis of the revived statute.
The results reached in D.P. and in R.A.H. v. State, 614 So.2d 1189 (Fla. 1st DCA 1993), are disapproved to the extent they are inconsistent with this opinion. We approve in part the decision below, though we do not agree with all of the reasoning the district court applied.
It is so ordered.
GRIMES, C.J., and WELLS, J., concur.
*997 MeDONALD, Senior Justice, concurs in result only with an opinion, in which OVERTON, J., concurs.
KOGAN, J., concurs in part and dissents in part with an opinion, in which SHAW, J., concurs.
HARDING, J., concurs in part and dissents in part with an opinion, in which SHAW and KOGAN, JJ., concur.

. "Commitment” should he distinguished from "secure detention.” Under the applicable statutes, secure detention is a means of detaining a juvenile in state custody pending a delinquency hearing. Commitment to a juvenile facility is one option the juvenile judge has after the child is adjudicated delinquent. Compare § 39.002(4), Fla.Stat. (Supp.1990) with § 39.01(18), Fla.Stat. (Supp.1990) and with § 39.01(45), Fla.Stat. (Supp.1990).

. This contrasts with the federal constitutional system, which was a creation of the thirteen original states and of those states subsequently joining the Union. Moreover, the creation of the federal Constitution also was an irrevocable surrender of certain sovereign powers — a point implicit in the federal Supremacy Clause but not finally established until the victory of Union forces in the Civil War.

. The federal approach might be more aptly called a "nondoctrine,” because it consists primarily of the refusal to act despite earlier precedent.

. We need not and therefore do not address that question today, for reasons noted below.

. This necessarily means that there cannot be a revival of any statute other than the immediate predecessor. If the immediate predecessor statute is defective, then no further revival is possible under any circumstances. There also may be cases in which the immediate predecessor statute was enacted so long ago in the past that it no longer reflects the consensus of society and therefore should not be revived. However, such is not the case before us today.