723 So.2d 199 (1998)
AVATAR DEVELOPMENT CORPORATION and Amikam Tanel, Petitioners,
v.
STATE of Florida, Respondent.
No. 91,424.
Supreme Court of Florida.
October 22, 1998.
Rehearing Denied December 28, 1998.
*200 Theodore Klein of Bierman & Shohat, Miami, and John H. Pelzer, Samuel S. Fields and Daniella Friedman of Ruden, McClosky, Smith, Schuster & Russell, P.A., Fort Lauderdale, for Petitioners.
Robert A. Butterworth, Attorney General, and Jonathan A. Glogau, Assistant Attorney General, Tallahassee, for Respondent.
David K. Thulman, Assistant General Counsel, Tallahassee, for State of Florida Department of Environmental Protection, Amicus Curiae.
ANSTEAD, Justice.
We have for review a challenge to the constitutionality of section 403.161, Florida Statutes (1993) which penalizes the willful violation of any administrative rule, regulation or permit condition promulgated for the purpose of preventing and controlling pollution. The Fourth District Court of Appeal in State v. Avatar Development Corp., 697 So.2d 561 (Fla. 4th DCA 1997), expressly declared the statute valid. Accordingly, we have jurisdiction under article V, section 3(b)(3) of the Florida Constitution. For the following reasons, we uphold the statute and approve the decision of the district court.

MATERIAL FACTS[1]
Petitioners, Avatar Development Corporation and Amikam Tanel (hereinafter referred to collectively as "Avatar") were charged with violating section 403.161(1)(b), Florida Statutes (1993) for failing to comply with special conditions to prevent pollution expressly set out in a dredge and fill permit issued by the Department of Environmental Protection (DEP) to Avatar. Avatar sought the permit to conduct dredge and fill operations in certain existing man-made canals tributary to the intracoastal waterway in Broward County.
DEP's permit contained a number of express conditions to the grant of approval. Under special condition three, Avatar was required to provide forty-eight hour notice to DEP prior to commencement of the dredge and fill operations:
3. At least forty-eight hours prior to commencement of work authorized by this permit, the permittee shall notify the Department of Environmental Protection, Bureau of Wetland Resource Management in Tallahassee, and the Southeast District District [sic] office in West Palm Beach, in writing of this commencement.
Pursuant to special condition five, Avatar was required to install turbidity curtains[2] around the shoreline of the canal to prevent pollution of adjacent waterways:
5. Prior to the commencement of any construction authorized by this permit, floating turbidity curtains with weighted skirts extending to the bottom of the man-made canals shall be properly installed around the shoreline stabilization areas and all areas to be dredged and filled, to isolate adjacent waters from the work area.... The floating turbidity curtains shall remain in place, be inspected daily and be maintained in good working order until all of the authorized work is complete, and turbidity levels in the project area are within 29 NTUs of background levels.
When Avatar failed to comply with permit conditions three and five, the State charged Avatar with violating section 403.161(1)(b). Pursuant to section 403.161(5), both of these alleged violations constitute first-degree misdemeanors punishable by fine or imprisonment or both.
On motion of Avatar, the county court dismissed the charges, finding section 403.161 unconstitutional as an invalid delegation of legislative authority as well as a violation of the Due Process Clause, and certified *201 the constitutional question[3] to the Fourth District Court of Appeal. The district court reversed and upheld the constitutionality of section 403.161.

LAW AND ANALYSIS
At issue in this case is section 403.161, which declares unlawful any violation of rules, regulations, and permit conditions promulgated by DEP for the purpose of accomplishing the Legislature's stated policy in preventing pollution. The section states in relevant part:
(1) It shall be a violation of this chapter, and it shall be prohibited for any person:
....
(b) To fail to obtain any permit required by this chapter or by rule or regulation, or to violate or fail to comply with any rule, regulation, order, permit, or certification adopted or issued by the department pursuant to its lawful authority.
§ 403.161(1)(b), Fla. Stat. (1993). Subsection (5) of the statute states that "[a]ny person who willfully commits a violation specified in paragraph (1)(b) ... is guilty of a misdemeanor of the first degree" punishable by fine or imprisonment or both. Id. § 403.161(5).

NONDELEGATION DOCTRINE
Our state constitution expressly prohibits delegation of powers from members of one branch to the members of the other branches of government. Under article I, section 18 of the Florida Constitution, "[n]o administrative agency shall impose a sentence of imprisonment, nor shall it impose any other penalty except as provided by law." Article II, section 3 declares a strict separation of the three branches of government and that: "No person belonging to one branch shall exercise any powers appertaining to either of the other two branches...." Our cases recognize this separation of powers. See Askew v. Cross Key Waterways, 372 So.2d 913, 924 (Fla.1978); State v. Atlantic Coast Line Railroad Co., 56 Fla. 617, 631, 47 So. 969, 974 (Fla.1908).
In Atlantic Coast Line Railroad Co., Justice Whitfield, writing for the majority, recognized the nondelegation doctrine, and succinctly explained its purpose and reach:
The Legislature may not delegate the power to enact a law, or to declare what the law shall be, or to exercise an unrestricted discretion in applying a law; but it may enact a law, complete in itself, designed to accomplish a general public purpose, and may expressly authorize designated officials within definite valid limitations to provide rules and regulations for the complete operation and enforcement of the law within its expressed general purpose.
56 Fla. at 636-37, 47 So. at 976. In this opinion the Court concluded that a statute creating a Railroad Commission and authorizing it to promulgate rules and regulations related to intrastate transportation of freight and passengers was not an unconstitutional delegation of legislative power. Id. at 628, 641-42, 47 So. at 973, 977. Moreover, the opinion noted that while the Legislature may not delegate the power to make a law prescribing a penalty,
it is competent for the Legislature to authorize the [Railroad] Commission to prescribe duties upon which the law may operate in imposing a penalty and in effectuating the purpose designed in enacting the statute. Where the penalty is imposed by law, it may be incurred for the penal violation of a rule prescribed by the Commissioners. The authority to make the rule must be given by the statute within definite limitations.
Id. at 639, 47 So. at 976 (emphasis added). The Court held that the discretion granted to the Railroad Commission to create rules and regulations did not constitute an invalid usurpation of legislative functions, because the authority granted was subject to limitations set by the Legislature and such authority was administrative in nature which was "essential to the complete exercise of the powers of all of the departments." Id. at 637, 47 So. at 976.
*202 In Askew, we reaffirmed the nondelegation doctrine and held that "the legislature is not free to redelegate to an administrative body so much of its lawmaking power as it may deem expedient." 372 So.2d at 924. Although we recognized the need for some flexibility in the administration of legislatively articulated policy, we noted that "flexibility in administration of a legislative program is essentially different from reposing in an administrative body the power to establish fundamental policy." Id. Accordingly, we held that:
Under [the non-delegation] doctrine fundamental and primary policy decisions shall be made by members of the legislature who are elected to perform those tasks, and administration of legislative programs must be pursuant to some minimal standards and guidelines ascertainable by reference to the enactment establishing the program.

Id. at 925 (emphasis added). We reasoned that only "[w]hen legislation is so lacking in guidelines that neither the agency nor the courts can determine whether the agency is carrying out the intent of the legislature in its conduct, then, in fact, the agency becomes the lawgiver rather than the administrator of the law." Id. at 918-19.
Consistent with our decision in Askew, we held in Brown v. Apalachee Regional Planning Council, 560 So.2d 782 (Fla.1990), that the combination of several chapters within the Florida Statutes provided the Apalachee Regional Planning Council (ARPC) with sufficient guidance in establishing rules for levying fees in accordance with the Legislature's intent:
Chapter 160 provides for the creation of regional planning councils (RPCs) to deal with the problems of growth and development, and gives each RPC the power "[t]o fix and collect ... fees when appropriate." § 160.02(12), Fla. Stat. (1983). Chapter 163 provides that local governments may agree to jointly exercise their power in order to make efficient use of local resources, and that such agreements may provide for "[t]he fixing and collecting of... fees, where appropriate." § 163.01(5)(h), Fla. Stat. (1983). Chapter 380 contains detailed provisions relating to DRIs and provides that regional planning agencies "may adopt additional rules ... to promote efficient review of developments-of-regional-impact applications." § 380.06(22)(c), Fla. Stat. (1983).
Chapters 160 and 163 thus give the ARPC authority to levy fees where "appropriate." Adoption under chapter 380 of a cost-based fee rule clearly promotes the "efficient review" of DRI applications and therefore is "appropriate." The legislature has set forth, in considerable detail, specific criteria to be used by the ARPC in conducting DRI reviews: which development projects must be reviewed, when review is to occur, who is to conduct review, and how review is to be performed. See ch. 380, Fla. Stat. (1983). Under these circumstances, given the highly technical nature of the DRI review process, details relating to the imposition of a cost-based review fee can be viewed as a technical matter of implementation rather than a fundamental policy decision.
Id. at 784-85. In so holding, we reasoned that the "specificity of the guidelines will depend on the complexity of the subject and the `degree of difficulty involved in articulating finite standards.'" Id. at 784 (quoting Askew, 372 So.2d at 918).

DELEGATION OF AUTHORITY TO DEFINE CRIMES
In these proceedings, Avatar claims that by granting DEP the power to create special conditions on permits, the violation of which constitutes a misdemeanor, the Legislature unconstitutionally delegated to DEP the power to define the elements of a crime. The crux of Avatar's argument is that the statute makes it a crime to violate the conditions of a permit, and gives DEP unfettered discretion to determine what the condition will be in the first instance. Avatar argues that the statute in this case lacks adequate guidelines limiting DEP's discretion in establishing permit conditions. Further, Avatar contends that the criteria relied upon by the State merely assist DEP in determining whether to issue permits without regard to what conditions should be placed in the permit. Because there are no limits on what *203 conditions DEP may place in a permit, Avatar argues that DEP's discretionary ability to define crimes are the same as those found unconstitutional in B.H. v. State, 645 So.2d 987 (Fla.1994).
The State, on the other hand, argues that it is the Legislature that defines the crime (i.e., violation of a permit condition), establishes the penalty (i.e., misdemeanor), and it is the State, acting through its state attorneys, and not DEP, that prosecutes violations of the statute. The State maintains that chapter 403 provides sufficient statutory guidelines and aspirational legislative goals to assist DEP in promulgating rules consistent with the Legislature's overall policy concerns.

B.H. v. STATE
As noted above, Avatar relies primarily upon the holding in B.H. v. State. In B.H., at issue was whether section 39.061, Florida Statutes (Supp.1990), unconstitutionally delegated to the Department of Health and Rehabilitative Services (HRS) the power to define the elements of the crime of escape. 645 So.2d at 989. B.H. was charged and convicted of escaping from a residential commitment facility. Pursuant to the statute:
An escape from any secure detention facility or any residential commitment facility of restrictiveness level VI or above ... constitutes escape within the intent and meaning of s. 994.40 and is a felony of the third degree.
Id. (emphasis added) (quoting § 39.061, Fla. Stat. (Supp.1990)). The statute did not define restrictiveness levels but, rather, left that task to the discretion of HRS to establish by rule. The only guidance given by the Legislature to HRS was that "there shall be no more than eight levels." Id. at 989-90 (quoting § 39.01(61), Fla. Stat. (Supp.1990)).
Based on this statute, HRS created four restrictiveness levels, dividing them by even numbers: level 2 (nonresidential); level 4 (low-risk residential); level 6 (moderate-risk residential); and level 8 (high-risk residential). Upon review, and after analyzing case law on the issue, we held:
The legislature may not delegate open-ended authority such that "no one can say with certainty, from the terms of the law itself, what would be deemed an infringement of the law." Conner [v. Joe Hatton, Inc.], 216 So.2d [209 (Fla.1968)] at 211 (emphasis added). In the present context, such an attempted delegation necessarily creates the simultaneous violation of article I, section 9 and article II, section 3 of the Florida Constitution. In other words, there is a due process violation for the statute's failure on its face to give adequate notice of the prohibited act; and there is a violation of the separation of powers in the attempt to give an administrative agency power to define a crime.
Both of those principles have been violated here. The statute we review today merely declares that the crime consists of "escape from any secure detention facility or any residential commitment facility of restrictiveness level VI or above." § 39.061, Fla. Stat. (Supp.1990). HRS, meanwhile, is given purported authority to define the "restrictiveness levels" in terms of broad custody categories based on "the risk and needs of the individual child," of which there can be no more than eight. § 39.01(61), Fla. Stat. (Supp.1990). Beyond this, no meaningful limitations are placed on HRS's purported authority.
Id. at 993-94. We expressly noted in B.H. that had HRS exercised the discretion granted to it by simply numbering the restrictiveness levels 1-4, no crime would have been committed under the statute. Id. at 994. HRS might well not have given the numbers "VI or above" to any of the facilities. Hence, HRS not only was vested with complete power to define the crime, one could not determine from the statute alone what conduct would constitute a criminal violation.
We do not agree that our decision in B.H. controls the outcome of this case. Rather, we agree with the reasoning of the district court in rejecting Avatar's claim. Specifically, the court found that DEP "is subject to express legislative control and guidance in the exercise of its authority." Avatar Development Corp., 697 So.2d at 565. In so holding the court found it is the legislative policy in Florida "to protect and conserve the air and waters of the state through control, regulation *204 and abatement of activities which cause pollution." Id. at 565-66. Moreover, the court reasoned that the Legislature had passed laws directing DEP to establish a permit system to regulate or prohibit activities which may be the source of air and water pollution. Id. at 566. Accordingly, the district court concluded that the establishment of permit requirements for dredge and fill operations was especially suitable for determination by DEP as an administrative body specifically charged with protecting Florida's natural environment from pollution and other harmful activities. Id. Further, the court held that Avatar was not deprived of due process because the permit Avatar received provided them with express and actual notice of the conditions upon which the permit was issued and section 408.161 unequivocally provided that noncompliance with such a permit constitutes a misdemeanor. Id.
Unlike the statute in B.H., section 403.161 does not leave to DEP the decision to determine which acts constitute a crime. Unlike the discretion granted to HRS, DEP has no authority to pick and choose which rule, regulation, or permit condition shall be prosecuted upon its violation. Rather, DEP utilizes its expertise and special knowledge to flesh out the Legislature's stated intent to prevent pollution by creating rules, regulations and permit conditions necessary to effectuate the Legislature's overall policy of preventing and controlling pollution in the infinite variety of situations that may occur in which Florida's natural environment may be threatened. The Legislature itself is hardly suited to anticipate the endless variety of situations that may occur or to rigidly prescribe the conditions or solutions to the often fact-specific situations that arise. On the other hand, DEP is peculiarly qualified and suited to handle this charge. Thus, the statute merely operates as an enforcement tool to ensure compliance with DEP's rules, regulations and permit conditions and does not provide DEP with unlimited discretion to define which acts constitute a crime.
Moreover, section 403.161 also clearly puts the public on notice as to which acts will result in criminal punishment. The statute unequivocally prohibits the willful violation of any rule, regulation or permit condition. See § 403.161(1)(b). The permit issued by DEP expressly states the conditions upon which it was issued. Thus, permit holders are aware that violation of any one of the conditions stated in the permit could result in criminal repercussions. Accordingly, we conclude that B.H. is inapposite to the facts in this case.
Further, the State argues, and we agree, that there are numerous other cases that present circumstances more akin to those involved herein. For example, the situation presented in Bailey v. Van Pelt, 78 Fla. 337, 82 So. 789 (1919), involved issues and facts similar to those involved in this case and the analysis and holding therein are supportive of the validity of the statute. In Bailey, we upheld the constitutionality of a statute creating a livestock sanitary board and authorizing it to promulgate rules and regulations to prevent and control the spread of communicable diseases in domestic animals. Section 19 of the statute[4] made it a misdemeanor, punishable by fine or imprisonment, for any person to knowingly and willfully violate any rule or regulation of the livestock sanitary board. 78 Fla. at 346-47, 82 So. at 792. Consequently, Bailey was charged and convicted of violating the rules and regulations of the board for his failure to dip his cattle for tick eradication. Upon review, we held:
"The legislature cannot delegate its power to make a law, but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government. There are many things upon which wise and useful legislation must depend which cannot be known to the lawmaking power, and must therefore be a subject of inquiry and determination outside the halls of legislation."
The authority to make administrative rules is not a delegation of legislative power, nor are such rules raised from an administrative to a legislative character because *205 the violation thereof is punished as a public offense.
Id. at 351-52, 82 So. at 794 (citations omitted) (emphasis added) (quoting United States v. Grimaud, 220 U.S. 506, 520, 31 S.Ct. 480, 55 L.Ed. 563 (1911)). We have applied this same analysis and reached a similar conclusion in a variety of other factual settings.
In State v. Cumming, 365 So.2d 153 (Fla. 1978), we upheld section 372.922, Florida Statutes (1977), which made it unlawful for any person to own or possess any wildlife without a permit. The statute granted the Florida Game and Fresh Water Fish Commission the authority to define wildlife within its rules. The statute limited the definition of wildlife to those animals which posed a "`real or potential threat to human safety'" and permits were to be issued "`only to persons qualified to possess and care properly for wildlife'" in accordance with the Commission's rules and expertise. Id. at 155 (quoting § 372.922, Fla. Stat. (1977)). Further, we noted that with regard to issuance of permits, the Commission was "not given the authority to `grant approval to one yet withhold it from another, at whim.'" Id. (quoting Dickinson v. State, 227 So.2d 36, 38 (Fla.1969)). Accordingly, we held that the statute was not an improper delegation of legislative authority where the "statutory guidelines adequately describe[d] the bounds within which the Commission [was] to promulgate its regulations." Id.[5]
Similarly, in Rosslow v. State, 401 So.2d 1107 (Fla.1981), the issue was whether section 601.50, Florida Statutes (1977),[6] which granted the Department of Citrus the authority to establish by administrative rule exemptions from a law making it a crime to sell and transport citrus fruit without a certificate of inspection, constituted an unconstitutional delegation of legislative authority. Specifically, section 601.50 listed several categories of fruit sales which could be exempted from the certificate requirement.[7] Appellant argued that the power to create exemptions from the law permitted the Department of Citrus to determine which acts were illegal under the statute. Relying on Atlantic Coast Line and Bailey, we held that the grant of authority to the Department of Citrus did not constitute an unconstitutional delegation of legislative power because section 601.46(1) clearly "sets forth what constitutes unlawful action under the section." Rosslow, 401 So.2d at 1108. Further, we held that section 601.50 sufficiently defined the limits on the authority of the Department of Citrus to create exemptions to the certificate requirement. Id.
Recently, the Fourth District in Marine Industries Ass'n of South Florida, Inc. v. Florida Department of Environmental Protection, 672 So.2d 878 (Fla. 4th DCA 1996), *206 held that a statute authorizing DEP to establish motorboat speeds in areas frequented by manatees did not constitute an unconstitutional delegation of legislative authority to an executive agency. Id. at 882. Relying on our holding in Askew, the court reasoned that the sufficiency of minimum standards depends on "`the subject matter dealt with and the degree of difficulty involved in articulating finite standards.'" Marine Industries, 672 So.2d at 881 (quoting Askew, 372 So.2d at 918). Because of the limited number of manatees, their mobility, and changes in their habitat, the court reasoned that "articulating exact standards would be difficult at best and probably subject to change on a yearly basis." Id. As such, DEP, due to its knowledge and expertise in monitoring the migratory habits of the manatee, would be able to determine which areas are frequented by manatees and the appropriate motorboat speed and operation regulation for that area. Id. at 882. Accordingly, the court held that the statute's reference to areas "where manatees are frequently sighted," provided sufficient guidance to DEP and courts reviewing administrative agency actions to determine whether the rule comported with legislative intent. Id. We agree with this analysis and its application here.

CHAPTER 403
Chapter 403, Florida Statutes (1997), entitled the "Florida Air and Water Pollution Control Act," is a comprehensive statutory scheme geared toward the control and prevention of pollution of the air and waters in Florida. Section 403.021 expressly articulates the legislative policy:
(1) The pollution of the air and waters of this state constitutes a menace to public health and welfare; creates public nuisances; is harmful to wildlife and fish and other aquatic life; and impairs domestic, agricultural, industrial, recreational, and other beneficial uses of air and water.
(2) It is declared to be the public policy of this state to conserve the waters of the state and to protect, maintain, and improve the quality thereof for public water supplies, for the propagation of wildlife and fish and other aquatic life, and for domestic, agricultural, industrial, recreational, and other beneficial uses and to provide that no wastes be discharged into any waters of the state without first being given the degree of treatment necessary to protect the beneficial uses of such water.
(3) It is declared to be the public policy of this state and the purpose of this act to achieve and maintain such levels of air quality as will protect human health and safety and, to the greatest degree practicable, prevent injury to plant and animal life and property, foster the comfort and convenience of the people, promote the economic and social development of this state, and facilitate the enjoyment of the natural attractions of this state. In accordance with the public policy established herein, the Legislature further declares that the citizens of this state should be afforded reasonable protection from the dangers inherent in the release of toxic or otherwise hazardous vapors, gases, or highly volatile liquids into the environment.
§ 403.021(1)-(3), Fla. Stat. (1993). Further, section 373.414, Florida Statutes (1993)[8] (formerly *207 section 403.918, Florida Statutes (1991))[9] lists several criteria for DEP to consider in determining whether a proposed activity contradicts the public interest. These criteria ask DEP to consider, among other things, whether a proposed activity will adversely affect public health, safety, or welfare of human beings and the conservation of fish and wildlife.
While chapter 403 grants DEP the authority to determine conditions upon which permits may be issued, that power is limited to conditions necessary to effectuate the Legislature's specific policy. For example, section 403.061 (powers and duties) authorizes DEP to establish all rules and regulations necessary "to control and prohibit pollution of air and water in accordance with the law and rules and regulations adopted and promulgated by it." § 403.061, Fla. Stat. (1993). Section 403.087(3) (issuance of permits) directs DEP to "issue permits on such conditions as are necessary to effect the intent and purpose of this section." Id. § 403.087(3). Finally, section 403.088(2)(c)3. (water pollution operation permits) provides that permits shall "[c]ontain such additional conditions, requirements, and restrictions as the department deems necessary to preserve and protect the quality of the receiving waters." Id. § 403.088(2)(c)(3). Thus, DEP's authority is limited to establishing administrative rules consistent with this specific legislative intent.
As we recognized in Askew and Brown, the sufficiency of adequate standards depends on the complexity of the subject matter and the "degree of difficulty involved in articulating finite standards." Askew, 372 So.2d at 918; Brown, 560 So.2d at 784. Clearly, environmental protection requires highly technical, scientific regulatory schemes to ensure proper compliance with legislative policy. It would be difficult, if not impossible, to require the Legislature to enact such rules, regulations and procedures capable of addressing the myriad of problems and situations that may arise implicating pollution control and prevention in Florida's varied environment.
Under the complexities of our modern system of government, the Legislature has recognized that DEP, as a specialized administrative body, is in the best position to establish appropriate standards and conditions for permit applicants to follow that reflect the Legislature's interest in protecting Florida's air and water from pollution-causing activities. DEP employs persons equipped with the knowledge and expertise necessary to handle such highly technical and intricate matters in the endless variety of real-life situations that are presented to the agency.

CONCLUSION
We conclude that the statute in this case appears to strike a practical and proper balance between the Legislature's function in establishing fundamental policy, and an administrative agency's administration and fulfillment of that policy through the promulgation of administrative rules and regulations and the issuance of conditional permits. The fact that section 403.161 provides criminal sanctions for the willful violation of administrative rules and regulations is of little consequence where it is the Legislature, and not the administrative body, that has declared such acts unlawful based upon express legislative policy.
In summary, we hold that section 403.161 constitutes a valid delegation of legislative authority to an administrative agency. Accordingly, we approve the decision below.[10]
It is so ordered.
*208 HARDING, C.J., and OVERTON, SHAW, KOGAN, WELLS and PARIENTE, JJ., concur.
NOTES
[1] The facts are taken from State v. Avatar Development Corp., 697 So.2d 561 (Fla. 4th DCA 1997).
[2] DEP, in its Answer Brief of Amicus Curiae, defines "turbidity" as "a measure of particles in the water which prevent light from penetrating the water column." See Answer Brief of Amicus Curiae at 2. Turbid water affects the health of aquatic ecosystems because the particles in the water prevent plants from growing and can smother benthic organisms if the particles settle out of the water column. Id. Standards for turbidity screens are found in rule 62-302.530(70) of the Florida Administrative Code.
[3] The trial court certified the following question: "Are Florida Statutes § 403.161(1)(b) or § 403.161(5) unconstitutional as charged in the information?"
[4] Ch. 7345, § 19, Laws of Fla. (1917).
[5] We ultimately held section 372.922 unconstitutional as applied because the Commission's rules and regulations failed to adequately define standards in accord with the statutory guidelines. Id. at 156. In contrast, Avatar does not challenge the adequacy of DEP's rules, regulations or permit conditions. Indeed, as noted above, we find that the permits issued by DEP expressly state the conditions upon which the permits are issued.
[6] Section 601.46 provides, in pertinent part:

(1) It is unlawful, except as provided in s. 601.50, for any person to sell or offer for sale, to transport, prepare, receive, or deliver for transportation or market any citrus fruit in fresh form unless such fruit has matured in accordance with the maturity standards and is accompanied by a certificate of inspection ... issued by a duly authorized fruit inspector of the Department of Agriculture and Consumer Services.
§ 601.46(1), Fla. Stat. (1977).
[7] Section 601.50 states in relevant part:

[T]he Department of Citrus under such precautionary rules and regulations as it may deem expedient may permit sale or shipment of citrus fruit or the canned or concentrated products thereof without the issuance of and filing of inspection certificate and without the grade being shown on the container thereof, of:
(1) Intrastate shipments of fresh citrus fruit for consumption or use within the state;
(2) Shipments to be used for charitable or unemployment relief purposes;
(3) Shipments to the United States Government or any of its agencies and interstate shipments to any packinghouse, canning plant, or concentrate plant for commercial processing, as may be defined by the Department of Citrus; or to fresh juice distributors outside the state;
(4) Shipments by any method of transportation by "gift fruit shippers," as defined by the Department of Citrus, but such shipments shall not be for the purpose of resale by the consignee thereof....
§ 601.50, Fla. Stat. (1977).
[8] Section 373.414(1) enumerates numerous criteria for DEP to consider:

(a) In determining whether an activity, which is in, on, or over surface waters or wetlands, as delineated in s. 373.421(1), and is regulated under this part, is not contrary to the public interest or is clearly in the public interest, the governing board or the department shall consider and balance the following criteria:
1. Whether the activity will adversely affect the public health, safety, or welfare or the property of others;
2. Whether the activity will adversely affect the conservation of fish and wildlife, including endangered or threatened species, or their habitats;
3. Whether the activity will adversely affect navigation or the flow of water or cause harmful erosion or shoaling;
4. Whether the activity will adversely affect the fishing or recreational values or marine productivity in the vicinity of the activity;
5. Whether the activity will be of a temporary or permanent nature;
6. Whether the activity will adversely affect or will enhance significant historical and archaeological resources under the provisions of s. 267.061; and
7. The current condition and relative value of functions being performed by areas affected by the proposed activity.
§ 373.414, Fla. Stat. (1993).
[9] In 1993, the Legislature repealed section 403.918, see ch. 93-213, § 45, at 2157, Laws of Fla., which originally listed the criteria for DEP to consider in issuing permits. Under the same law, the criteria were transferred to section 373.414(1). See ch. 93-213, § 30, at 2144.
[10] We reject without discussion petitioners' remaining point on review that section 403.161 is a special law which the constitution expressly prohibits from being created for the purpose of punishing crimes.